# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| SHARON HAWKINS, individually and derivatively on behalf of MEDAPPROACH, L.P., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2021-0453-JTL |
| W. BRADLEY DANIEL, an individual, and MEDAPPROACH HOLDINGS, INC., a Delaware corporation, | ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| MEDAPPROACH, L.P., a Delaware limited partnership, | ) ) ) | |
| Nominal Defendant. | ) | |

## OPINION

Date Submitted: January 24, 2022
Date Decided: April 4, 2022

Richard I. G. Jones, Jr., John G. Harris, BERGER HARRIS LLP, Wilmington, Delaware; *Attorneys for Plaintiff.*

David J. Teklits, Sara Toscano, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jeffrey Alan Simes, Jessica Vogele, GOODWIN PROCTER LLP, New York, New York; *Attorneys for Defendants.*

**LASTER, V.C.**

By executing a proxy, an owner of shares separates the voting rights associated with the shares from the underlying economic interest. Because of the potentially mischievous effects that can flow from a divergence of interests between principal and proxyholder, Delaware law requires that a grant of proxy authority be plain and unambiguous, and a court applying Delaware law will construe any ambiguity against the grant of authority.

The owner of shares can make a grant of proxy authority irrevocable. By doing so, the owner disables itself from being able to terminate the arrangement and reunite the voting rights with the economic interest. The creation of an irrevocable proxy exacerbates the risk of a divergence of interests between principal and proxyholder, precisely because the principal abjures the oversight authority inherent in the ability to terminate the proxy arrangement. Consequently, Delaware law requires an even greater showing to create an irrevocable proxy. In addition to the plain and unambiguous language needed to create the proxy relationship and make it irrevocable, Delaware law requires that the proxyholder have an interest in the subject matter of the proxy relationship that is legally sufficient to support an irrevocable grant of agency power.

The grant of authority that an owner of shares confers on a proxyholder typically terminates when the owner sells the shares. After transferring the shares, the original principal that granted the authority no longer owns the shares, no longer has the right to vote them, and would not be able to grant authority to vote them to a new proxyholder. All of those rights vest in the new owner. Consequently, under default principles of law, even an irrevocable proxy generally terminates when the owner sells the shares.

By using plain and unambiguous language, an owner can create an irrevocable proxy that binds a subsequent owner of the shares. In colloquial terms, the proxy "runs with the shares," with the proxyholder continuing to possess the agency power to vote the shares. A new owner who knew of the irrevocable proxy at the time of purchase acquires the shares subject to the proxy. From a corporate governance perspective, such an arrangement risks ingraining the potentially problematic severing of the voting rights associated with shares from the underlying economic interest. The creation of an irrevocable proxy that runs with the shares thus requires particularly clear language.

MedApproach, L.P. (the "Partnership") is a Delaware limited partnership that dissolved on February 28, 2021. As its principal asset, the Partnership owns shares comprising 75% of the issued and outstanding equity of N.D. Management, Inc. (the "Majority Shares"). Over two decades ago, the previous owner of the Majority Shares executed an irrevocable proxy that granted three individuals (the "Holders") the authority to vote the Majority Shares (the "Irrevocable Proxy"). When the Partnership acquired the Majority Shares, it bound itself to the Irrevocable Proxy.

The plaintiff owns 88% of the limited partner interests in the Partnership. She seeks a declaratory judgment that the Irrevocable Proxy does not run with the Majority Shares and that the Partnership can sell the Majority Shares free and clear of the Irrevocable Proxy. The defendants benefit from the Irrevocable Proxy. They contend that the Irrevocable Proxy runs with the Majority Shares, effectively operating as a permanent control arrangement that must remain in place unless and until the Holders terminate it.

2

This decision holds that the Irrevocable Proxy does not run with the Majority Shares. The plain language of the Irrevocable Proxy supports that result. So does the parties' conduct. When they decided that the predecessor to the Partnership ("Old MedApproach") would purchase the Majority Shares, the parties drafted an addendum to the Irrevocable Proxy (the "Addendum") in which Old MedApproach bound itself to the Irrevocable Proxy. If the Irrevocable Proxy ran with the Majority Shares, then the Addendum would not have been necessary.

The Addendum contains a complex and convoluted sentence which the defendants contend prevents the Partnership from selling the Majority Shares unless the subsequent owner binds itself to the Irrevocable Proxy. This decision holds that the transfer restriction applies to any sale to an affiliate, but not to a sale to a third party.

The plaintiff also sought a declaratory judgment regarding how the defendants must act when selling the Majority Shares. That issue is not ripe for adjudication. During the pendency of this litigation, the general partner agreed not to take any steps to pursue a transaction involving the Majority Shares, and no transaction is currently pending. Any judicial declaration at this stage would constitute an advisory opinion.

## I.     FACTUAL BACKGROUND

Trial took place on September 23, 2021. The record is mercifully limited. The parties introduced fifty-five exhibits, including four deposition transcripts. Four fact

witnesses testified live. The following factual findings represent the court's effort to distill this record.[1]

## A.     A Complex Entity Structure

RU-486 is an oral abortifacient. In 1994, at the request of then-President William J. Clinton, a French pharmaceutical company granted a license to manufacture, market, and distribute RU-486 in the United States to Population Council, Inc. ("Popco"), an international not-for-profit corporation focused on family planning.[2]

Popco sought to sublicense its rights to a party that would commercialize RU-486. Due to the political climate in the 1990s, major pharmaceutical companies did not want to become involved. Popco ultimately selected Joseph D. Pike, an investor who previously worked with Popco on other projects involving contraceptives.

Pike formed Danco Laboratories, Inc. a Cayman Islands company, as the operating entity for the venture. Danco Laboratories, Inc. subsequently became and remains a Delaware limited liability company called Danco Laboratories, LLC (together with Danco

---

[1] In the pre-trial order, the parties agreed to thirty-one stipulations of fact, which this decision relies on where applicable. Citations in the form "PTO ¶ —" refer to stipulated facts in Section II of the pre-trial order. Dkt. 71. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX —— at —" refer to a trial exhibit with the page designated by the internal page number or, if the document lacked an internal page number, by the last three digits of the JX number. If a trial exhibit used paragraph numbers, then references are by paragraph.

[2] PTO ¶ 5; JX 13 at 3; *see also* Memorandum for the Secretary of Health and Human Services, Importation of RU-486, 58 Fed. Reg. 7459 (Jan. 22, 1993).

Laboratories, Inc., "Danco Labs"). Through an affiliate, Popco granted a sublicense to Danco Labs.[3]

Pike created Neogen Investors L.P., a California limited partnership, as a holding company that would raise equity financing. Its successor is a California limited partnership called Danco Investor Group, L.P. For simplicity this decision refers to the limited partnership as "Danco LP." Danco LP owns 100% of the equity in Danco Labs.

Pike formed N.D. Management, Inc., a Cayman Islands company, to serve as the general partner of Danco LP. Because of that role, this decision refers to N.D. Management as "Danco GP." Danco GP subsequently became a Delaware corporation.

Pike originally owned 100% of the stock in Danco GP. Through Danco GP, he controlled Danco LP. Through Danco LP, he controlled Danco Labs.[4]

---

[3] *See* PTO ¶ 6; JX 13 at 4. For reasons not evident from the record, the sublicense reached Danco Labs in two steps. First, Popco granted a sublicense to Advances in Health Technology, Inc. ("Advances"), a Delaware not-for-profit corporation. JX 13 at 4. Advances then granted a sub-sublicense to Danco Labs. *See id.* at 58. The documents therefore often refer both to Popco and Advances. The parties later simplified the structure by eliminating Advances. This decision elides over the involvement of Advances, which is not material to the outcome of the case.

[4] *See id.* at 2. For purposes of this litigation, the parties have agreed on this structure. In reality, Pike included an additional, intermediate holding company known as NeoGen Holdings, L.P., that owned all of the equity in Danco Labs. That entity subsequently changed its name to Danco Holdings, L.P. Danco LP owned all of the limited partner interest in Danco Holdings. Danco GP acted as the general partner for both Danco LP and Danco Holdings. Pike also formed Neogen Pharmaceuticals, Inc. as a separate entity to develop, manufacture, market, and distribute RU-486 for uses other than as an abortifacient. That entity subsequently changed its name to Danco Pharmaceuticals, Inc. Danco LP owned all of the equity in Danco Pharmaceuticals. *See id.* at 2, 58.

5

Pike raised equity capital by selling limited partner interests in Danco LP. Beginning in 1995, Pike raised approximately $13.35 million to support the commercialization of RU-486 (the "Project").

**B.      Daniel and Mr. And Mrs. Hawkins Become Involved.**

In 1995, defendant W. Bradley Daniel was operating a nascent private equity fund. After learning about the Project, Daniel met with Pike in May 1995. Daniel wanted to invest, and he formed Old MedApproach, a Tennessee limited partnership, as a special purpose vehicle to make the investment.[5]

Daniel's cousin was a childhood friend of non-party Gregory Hawkins, a principal in the now-notorious hedge fund, Long-Term Capital Management L.P. The fund was then in its salad days. Three years later, in 1998, the firm's massively overleveraged positions threatened to take down the global financial markets, forcing the Federal Reserve to assemble a consortium of financial institutions to bail out the firm and prevent a market meltdown. *See generally* Roger Lowenstein, *When Genius Failed: The Rise and Fall of Long-Term Capital Management* (2000).

---

[5] The general partner of Old MedApproach was Bio-Pharm Investments, Inc., a Tennessee corporation, which Daniel controlled. Daniel and his business partner at the time, Dan Hipp, owned all of the shares of Bio-Pharm Investments. Daniel would later buy out Hipp. *See* Daniel Tr. 167.

6

Daniel's cousin suggested to Mr. Hawkins[6] that he invest in the Project through Daniel's firm. Mr. Hawkins subsequently purchased limited partner interests in Old MedApproach, and Old MedApproach used the funds to purchase limited partner interests in Danco LP. By 1996, Mr. Hawkins had invested $1.5 million and owned approximately 75% of the limited partner interests in Old MedApproach. *See* PTO ¶¶ 8–9; G. Hawkins Tr. 16.

The plaintiff, Mrs. Hawkins, is the spouse of Mr. Hawkins. In 1998, when the implosion of Long-Term Capital placed his personal wealth at risk, Mr. Hawkins transferred his investment in Old MedApproach to Mrs. Hawkins. Although she filed this case, he is the real decisionmaker. Mrs. Hawkins testified that she follows her husband's wishes regarding the investment, and it was Mr. Hawkins, not Mrs. Hawkins, who gave substantive testimony.[7]

---

[6] My usual practice is to refer to individuals using their last names without honorifics, or alternatively to use first names. This decision departs from that practice and refers to Gregory and Sharon Hawkins, respectively, as "Mr. Hawkins" and "Mrs. Hawkins." Doing so recognizes that this case is one of many in which the Hawkins have squared off with Daniel, and those appellations track how other courts have referred to Mr. and Mrs. Hawkins in their decisions.

[7] *See* S. Hawkins Tr. 7–8. *Compare id.* at 7 (Mrs. Hawkins testifying that she understood a proxy was at the center of this dispute and explaining her goal for the proxy was "[w]hatever my husband would like to see happen to it"), *with* G. Hawkins Tr. 49–52 (Mr. Hawkins testifying about conversations he had with Daniel and Freeman regarding the removal of the Irrevocable Proxy).

## C.    The Revelations About Pike

In 1996, Popco learned that in May of that year, Pike had pled guilty to misdemeanor forgery charges in North Carolina arising out of a transaction that took place in 1985. Pike received a two-year suspended sentence, was placed on probation for eighteen months, and was required to pay a $300 fine and perform 500 hours of community service. Pike was also disbarred from the practice of law in North Carolina. Pike had not disclosed his legal difficulties or the underlying events to Popco. Nor had he disclosed those matters when soliciting investors in Danco LP. Popco also believed that Pike had made misleading disclosures to investors about the potential uses of their capital, the payment of fees and commissions, and the ability of non-accredited investors to acquire interests in Danco LP.[8]

In November 1996, Popco sued to remove Pike from his roles and rescind his interest in the Project. Popco also threatened to cancel the sublicense with Danco Labs.[9]

Pike called a meeting of the investors in the Project, which took place in San Diego on December 11, 1996. A Popco representative and its counsel attended by telephone.

The purpose of the meeting was to determine if there was any way to continue the Project. Popco had two non-negotiable requirements. First, Pike no longer could have any

---

[8] *See* PTO ¶¶ 10–11; JX 13 at 25–28, 58–59, 75; G. Hawkins Tr. 18; Daniel Tr. 128–29, 171.

[9] *See* PTO ¶ 11; JX 13 at 59; G. Hawkins Tr. 71–72.

control over the Project or any role in its management. Second, the investors that Pike brought into the Project had to have the opportunity to get their money back.[10]

At the meeting, five individuals stepped forward to represent the limited partners and attempt to negotiate a solution: Daniel, Brian Freeman, Jeff Rush, Richard Cusac, and William Elkus (the "LP Representatives"). *See* JX 2 at 2. Any agreement they reached would be presented to the investors for their review and approval.[11]

Freeman and Rush had solicited investors for the Project, served as advisors to Pike, and owned limited partner interests in Danco LP.[12] Cusac and Elkus owned limited partner interests in Danco LP, but the record does not disclose much else about them. They seem to have played a secondary role and quickly faded from view.

Daniel attended the meeting on behalf of Old MedApproach, and he reported back to Mr. Hawkins about what took place. Mr. Hawkins did not attend in person. Because of controversy surrounding RU-486, he wanted to avoid any public association with the Project. Mr. Hawkins also did not participate directly in the negotiations with Pike and

---

[10] *See* PTO ¶ 12; G. Hawkins Tr. 20–21; Daniel Tr. 174–75. Daniel testified that Popco insisted on establishing a permanent control arrangement that could never change so that something like the Pike problem could not happen again. Daniel Tr. 145–46. There is no corroborating evidence for that demand, and it seems too conveniently tailored to Daniel's interests in the case. It also runs contrary to Popco's evident desire, manifested in the contemporaneous documents, for the Project eventually to be owned by an entity with a conventional governance structure.

[11] *See* JX 13 at 75; Daniel Tr. 127–28, 131–32, 172.

[12] *See* JX 13 at 54–56, 79–80.

9

Popco. Daniel, however, communicated regularly with Mr. Hawkins, sought his input, and kept him abreast of developments.[13]

## D.     The Settlement Agreement

By late January 1997, the LP Representatives had reached an agreement that would achieve Popco's goals and enable the Project to continue. In substance, Pike agreed to resign from all of his roles in the Project, sell 75% of his equity in the Project, and give up his voting rights over the remaining 25% of his equity.

The terms of the deal were memorialized in a settlement agreement. JX 1 (the "Settlement Agreement" or "SA"). Pike's equity interest in the Project took the form of his ownership of 100 shares in Danco GP, which comprised all of the issued and outstanding stock of that entity. Pike committed to sell 75 shares, constituting the Majority Shares. He would retain the other 25 shares (the "Pike Shares") but give up his right to vote those shares.

In return for exiting from the Project and selling the Majority Shares, Pike received the contractual right to payment of 50% of the distributions on the Majority Shares, up to a cap of $21.875 million. SA § IV(B)(1)(b). As an advance on those amounts, Pike received an upfront loan in the amount of $3.5 million (the "Pike Loan"), which would be repaid from the first $3.5 million of those distributions. *Id.* §§ III(A), IV(B)(1)(a). Pike also

---

[13] *See* G. Hawkins Tr. 18, 72–74; Daniel Tr. 126–27, 132, 139–40, 170–71; G. Hawkins Dep. 72–73.

10

received a consulting agreement that would pay him $300,000 per year for five years. *Id.* § IV(B)(2)(a).

Pike agreed that as soon as the Pike Loan was funded, he would resign all of his positions at any entity associated with the Project and transfer 49.9% of his shares in Danco GP. *Id.* §§ IV(A)(1)(a)(i), IV(A)(3). After Popco and the limited partners in Danco LP approved the Settlement Agreement, Pike would transfer another 25.1% of his shares. *Id.* § IV(A)(1)(a)(ii). Only after the second transfer would Pike have given up control over the Project by transferring the Majority Shares.

The Settlement Agreement envisioned that the "Participating Investors," as defined would acquire the Majority Shares. The Settlement Agreement defined the Participating Investors as Old MedApproach, Rush, Freeman, Cusac, and Elkus, plus any other limited partners in Danco LP who wanted to join.

Popco wanted Pike to give up control over the Project as soon as possible. To achieve that goal, Pike agreed to transfer voting power over all 100 shares, as soon as he received the Pike Loan. The vehicle for the immediate transfer of voting power was the Irrevocable Proxy. As described in greater detail in the Legal Analysis, Pike irrevocably appointed Daniel, Freeman, and Rush as his proxies to vote all 100 shares (the "Proxy Shares"). JX 5.

The Settlement Agreement also addressed Popco's demand that any investors that Pike had brought into the Project be able to get their money back. The Settlement Agreement contemplated that the Participating Investors would fund an offer to purchase

11

the interests of any limited partner in Danco LP who wanted to rescind its investment (the "Rescission Offer"). *See* SA § IV(D). Although primarily intended to achieve Popco's demand that limited partners be allowed to rescind their investment, the Rescission Offer would include an option for limited partners to invest more funds in the Project.

The Settlement Agreement contemplated that at a later date, the Participating Investors could restructure the entities comprising the Project through the creation of a "Newco." *See id.* §§ IV(A)(2), IV(D). The purpose of the restructuring would be to establish a conventional corporate governance structure for the Project, replacing the entity structure that Pike had created to give himself sole control. Daniel Tr. 137–38; *see* G. Hawkins Tr. 37–38, 79–80.

## E.    The Solicitation Of The Limited Partners' Consent

The effectiveness of the Settlement Agreement was conditioned on the approval of a majority of the limited partners in Danco LP. SA § III(A). The Settlement Agreement also contemplated that the limited partners in Danco LP could become Participating Investors. *See id.* § I(E).

To obtain the limited partners' approval and give them the opportunity to become Participating Investors, the LP Representatives circulated a short memorandum dated January 24, 1997, that described the Settlement Agreement. JX 2 (the "Settlement Memorandum"). The Settlement Memorandum asked the limited partners to return a form by January 31, 1997, stating whether they supported or opposed the Settlement Agreement and indicating whether they wanted to become Participating Investors. *Id.* at 4.

12

The Settlement Memorandum explained that if a limited partner opted to become a Participating Investor, then the limited partner would receive a pro rata interest in the Majority Shares. But the Settlement Memorandum also explained that the limited partner would have to fund a pro rata share of (i) the financial commitments to Pike in the Settlement Agreement, (ii) the Rescission Offer, and (iii) "up to $14 million additional capital contributions to 'top up' the capital of [Danco LP] to the $27.5 million level contemplated in the original Partnership documents (or such lesser amounts as may be negotiated with [Popco])." *Id.* at 2. The amount that a would-be Participating Investor had to commit to fund depended on how many limited partners became Participating Investors and how many limited partners later accepted the Rescission Offer. The Settlement Memorandum stated that any limited partner who agreed to become a Participating Investor would be informed of the amount of their required capital contribution on February 5, 1997, with the amount due less than a week later. *Id.* at 4.

## F. The Deal Changes.

The effort to solicit the limited partners to participate in the Settlement Agreement was problematic in many ways. For starters, the Settlement Memorandum gave the limited partners just one week to respond, and it asked them to take on an uncertain financial commitment. In addition, to the extent there were problems with the disclosures surrounding the original solicitation of the investors—a major concern for Popco—the Settlement Memorandum did not cure those deficiencies. If anything, it exacerbated them

13

by layering a second poorly disclosed solicitation of consent on top of Pike's flawed original solicitation of capital.

Perhaps most significantly, it soon became clear that having other limited partners in Danco LP participate in acquiring the Majority Shares would delay the effectuation of the Settlement Agreement. Extending the timeline would put the deal at risk.

To sidestep these issues and enable the Settlement Agreement to be implemented more quickly, Mr. Hawkins suggested that Old MedApproach buy the Majority Shares. The long-term plan continued to be that after completing the transactions contemplated by the Settlement Agreement, including the Rescission Offer, Old MedApproach and the other entities associated with the Project would reorganize to adopt a more conventional corporate governance structure.

The LP Representatives therefore pivoted to a revised settlement in which Old MedApproach alone bought the Majority Shares (the "Revised Settlement"). But that step created a problem for the Irrevocable Proxy and its role as a bridge to a more conventional corporate governance structure. Pike was granting the Irrevocable Proxy in his capacity as the owner of the Majority Shares. The general rule is that an agency relationship terminates when the principal sells the property that is the subject of the agency relationship. Pike's grant of agency authority under the Irrevocable Proxy therefore would terminate when he sold the Majority Shares to Old MedApproach.

Popco wanted to make sure that Old MedApproach would be bound by the Irrevocable Proxy until the anticipated reorganization was complete. To address that issue,

14

Popco's attorney added the Addendum to the Irrevocable Proxy. In the Addendum, Old MedApproach agreed to be bound by the Irrevocable Proxy once it became the owner of the Majority Shares. JX 5 at 5. The Addendum also contains convoluted language about when Old MedApproach must require a buyer of the Majority Shares to bind itself to the Irrevocable Proxy. *See id.* That language operates as a transfer restriction.

Just one week after distributing the Settlement Memorandum, the LP Representatives circulated a second memorandum to the limited partners that described the Revised Settlement. A copy of that memorandum does not appear in the record. According to the materials for the Rescission Offer, the second memorandum explained that Old MedApproach would acquire the Majority Shares and that the limited partners would not be given an opportunity to participate. JX 13 at 76. Daniel testified at trial that although some limited partners wanted to become Participating Investors, he and the other LP Representatives "closed it down" because they felt they "were running out of time" to implement the settlement. Daniel Tr. 181–82.

The limited partners approved the Revised Settlement. Given their alternatives, that was hardly surprising. That choice both preserved the Project and provided a clear path for dissatisfied investors to get their money back through the Rescission Offer.

As a result of this structure, none of the other limited partners in Danco LP became Participating Investors. Even Cusac and Elkus opted not to be Participating Investors. The only Participating Investors, and the only counterparties to the Settlement Agreement, were Old MedApproach, Freeman, and Rush. They entered into a letter agreement dated

15

February 4, 1997, in which they agreed on an allocation of the funding commitment: Freeman and Rush each agreed to fund 25%, Old MedApproach agreed to fund the remaining 50%, and Mr. Hawkins agreed to backstop Old MedApproach's commitment.[14]

With the Revised Settlement approved, Mr. Hawkins transferred $3.5 million to the Partnership to fund the Pike Loan. On February 11, 1997, Pike acknowledged receipt of the loan funds, delivered executed copies of resolutions transferring the Majority Shares to the Partnership, and submitted his resignations. JX 6. The initial set of transactions was complete, and Pike no longer had any control over the Majority Shares, Danco GP, or the Project. On February 12, 1997, the parties to Popco's lawsuit filed a stipulation dismissing the case with prejudice. JX 13 at 77–78.

## G. The Delay Of The Rescission Offer

The next step was to complete the Rescission Offer. The parties intended to complete it in 1997, but a series of events delayed matters until August 1998.

First, the pharmaceutical company that Danco Labs had contracted with to manufacture RU-486 repudiated the agreement, claiming that Danco Labs had failed to provide required financial information. JX 13 at 5, 48, 59; *accord* Daniel Tr. 238. The Participating Investors did not want to launch the Rescission Offer without a committed manufacturer, fearing that investors would be more likely to want their money back and less likely to commit more funds.

---

[14] *See* JX 3 at 1-2; G. Hawkins Tr. 28–30, 34; Daniel Tr. 189–90, 194.

Second, Freeman became a problem. He wanted to receive additional compensation as an attorney or consultant to the Project, and he frequently threatened to sue other people involved with the Project.[15] Rush became so fed up with Freeman that he submitted his resignation as a Holder. By letter dated July 17, 1997, Daniel and Freeman accepted Rush's resignation. JX 8. In this proceeding, Daniel has claimed that he "never implemented" Rush's resignation, even though nothing in the Irrevocable Proxy gives Daniel any authority over that subject. Daniel Tr. 142–43. The Irrevocable Proxy does not place any limits on the effectiveness of a Holder's resignation. It requires the unanimous consent of the Holders to *remove* one of the Holders. *See* JX 5 § 7(ii). It does not give the other Holders any authority over an attempt to resign. Daniel claimed in this litigation that he later convinced Rush not to resign. *See* Daniel Tr. 142–43. The parties to this case have not placed Rush's status as a Holder at issue, and the court makes no finding regarding Rush's status.

Third, the Holders filed suit against Pike, claiming that he breached the Settlement Agreement. The Holders sought to accelerate the Pike Loan and recover the balance from Pike personally. *See* JX 13 at 78.

Fourth, Mr. Hawkins suffered personal financial difficulties when Long-Term Capital collapsed. With the demise of his firm, Mr. Hawkins was not sure that he could

---

[15] G. Hawkins Tr. 93; Daniel Tr. 142–43; Daniel Dep. 176–77; *see* JX 16.

17

fund his commitments to Old MedApproach. It was at this point that Mr. Hawkins assigned all of his interests in Old MedApproach to Mrs. Hawkins.[16]

Despite these setbacks, the parties continued to prepare for the Rescission Offer. As part of that process, they documented specific amounts of compensation that Freeman, Rush, and Daniel would receive for serving as Holders. In a letter agreement dated May 31, 1998, Old MedApproach acknowledged that Daniel could receive $300,000 per year from Danco LP. JX 10 at 1. Freeman and Rush could receive $50,000 per year, plus a $2,500 per diem for Rush and $3,000 per diem for Freeman. *Id.* Danco LP also could reimburse each Holder for their out-of-pocket expenses. *Id.* at 2. Finally, the parties would use "commercially reasonable efforts to cause [Danco LP] to compensate . . . Freeman and Daniel, at customary market rates, for such additional special services as they may provide." *Id.* Mr. Hawkins negotiated, authorized, and signed the letter agreement on behalf of the limited partners in Old MedApproach. JX 11; Daniel Tr. 241; *see* G. Hawkins Dep. 220–21.

The amounts that Daniel received increased with inflation, and by 2020, his retainer had reached $500,000 per year. Since 1996, Daniel has earned approximately $10.3 million in proxy fees from Danco LP. Daniel Tr. 227–28; *see* JX 49. Daniel also is a party to an indemnification agreement with the Partnership, Danco GP, and Danco LP. Daniel Tr. 228; *see* JX 53. Under that agreement, Daniel receives a fee of $3,000 for each day spent

---

[16] *See* PTO ¶ 17; S. Hawkins Tr. 7–8; G. Hawkins Dep. 182.

18

working on litigation involving the Project. Daniel Tr. 228; *see* JX 53. Daniel also earns additional income through an entity that leases office space to Danco GP and Danco LP. Daniel Tr. 226–27.

## H.     The Completion Of The Rescission Offer

On August 5, 1998, Danco LP launched the Rescission Offer by circulating an offering memorandum to its limited partners. JX 13 (the "Offering Memorandum"). Through the Rescission Offer, Danco LP sought to raise up to $27.5 million, consisting of $14.15 million in new capital and up to $13.35 million to repurchase the interests of any limited partner who wanted to exit from Project. PTO ¶ 16.

The Offering Memorandum described the terms of the Revised Settlement, including the Irrevocable Proxy. The Offering Memorandum explained that Danco GP controlled Danco LP and that Danco GP "is controlled by the [ ] Holders." JX 13 at 18. The Offering Memorandum elsewhere stated:

> Pursuant to an Irrevocable Proxy and Power of Attorney, dated February 5, 1997, [Old MedApproach], Mr. Pike and his wife granted to Messrs. Daniel and Freeman and Dr. Rush . . . proxies to vote their respective interests in the General Partner. Accordingly, the General Partner is in effect managed by or under the direction of the [ ] Holders.

*Id.* at 49.

The Offering Memorandum did not address whether the Irrevocable Proxy would bind any subsequent owner of the Majority Shares. It did not suggest that the Irrevocable Proxy ran with the Majority Shares. It also did not suggest that the Irrevocable Proxy would terminate as to any of the Majority Shares that were sold.

19

The Rescission Offer closed in 1999. It raised $23,901,966, less than the goal of $27.5 million. *See* Van Vranken Tr. 250. Mr. Hawkins could not recall exactly how much he contributed to the Rescission Offer, but he guessed $5–6 million. To fund his commitment to Old MedApproach, Mr. Hawkins brought in several friends as co-investors. G. Hawkins Tr. 31–34, 40.

## I.  Freeman Resigns.

By letter dated May 17, 1999, Freeman informed Daniel and Rush that he would no longer serve as a Holder or as a director of Danco GP. He explained that he was resigning in part because "upon the completion or termination of the current financing, restructuring, [and] rescission efforts, the role of [ ] Holder is no longer necessary." JX 16. That assertion evidences the pre-litigation understanding of a party closely involved in the settlement, and it indicates that the Irrevocable Proxy was not intended as a permanent control arrangement.

In his deposition, Daniel could not recall whether Freeman ever officially resigned. *See* Daniel Dep. 219–20. At trial, Daniel claimed that he "allowed" Freeman to resign. Daniel Tr. 209–10. As noted previously, Daniel had no ability to veto another Holder's resignation. The issue is moot because Freeman died in 2001, leaving Rush and Daniel as the only remaining Holders. No one ever replaced Freeman as a Holder.

## J.  The Restructuring Of Old MedApproach

After the closing of the Rescission Offer, Daniel restructured Old MedApproach by dividing it into three entities, each of which held a different type of investment in the

20

Project (the "MedApproach Restructuring"). To effectuate the MedApproach Restructuring, Old MedApproach dissolved, and during the winding up process, it made non-pro rata distributions of assets to three newly formed Delaware limited partnerships (the "Three Partnerships"). One of those entities was the Partnership. The other two entities were DIG Equity LP and DIG Special Assets LP. Daniel formed defendant MedApproach Holdings, Inc. ("Holdings") to serve as the general partner of each of the Three Partnerships. Daniel is the sole owner of all of the equity in Holdings.

The Partnership received the Majority Shares. DIG Equity LP received limited partner interests in Danco LP that were purchased as part of the initial investment in 1995. DIG Special Assets received limited partner interests in Danco LP that resulted from converting subsequent loans into equity. *See* JX 17 at '917; Daniel Dep. 22–24.

The Partnership was an affiliate of Old MedApproach, making it a "MedApproach Person" for purposes of the Addendum. JX 5 at 5. As contemplated by the Addendum, the Partnership executed an Agreement To Be Bound By Irrevocable Proxy And Power Of Attorney. JX 17 at '891.

The parties agree that the following diagram accurately depicts the current organizational structure of the relevant entities after the MedApproach Restructuring. It refers to Holdings as "Med Approach Holdings." It refers to the Partnership by its formal name, "MedApproach LP." And it refers to Danco GP as "N.D. Management." Except for the fact that the Partnership has dissolved and entered the winding up phase, the diagram reflects the organizational structure of the relevant entities as it continues to exist today.

21



JX 52; *accord* JX 17 at '879. Through the Irrevocable Proxy, the Holders continue to control Danco GP, which continues to control Danco LP and Danco Labs. But for the Irrevocable Proxy, the Partnership would control Danco GP through its ownership of the Majority Shares. By controlling Danco GP, the Partnership would control Danco LP and Danco Labs.

Under this structure, Danco Labs distributes its profits to Danco LP. Danco LP distributes 20% of its profits to Danco GP, which Danco GP uses to pay dividends. As the owner of the Majority Shares, the Partnership receives 75% of any dividend. As the owner of the Pike Shares, Pike receives the other 25%. Daniel Tr. 221.

Danco LP distributes the remaining 80% of its profits to its limited partners. In addition to owning the Majority Shares, the Partnership owns a 2.71% limited partner interest in Danco LP. Through its ownership of the Majority Shares and the limited partner

interest in Danco LP, the Partnership receives approximately 17.71%[17] of the profits generated by Danco Labs. Daniel Tr. 219–21.

The Partnership pays Holdings a 1% management fee. Holdings also receives distributions on a 10% carried interest. After paying its expenses, Holdings distributes any remaining amounts to Daniel. Daniel Tr. 222, 225.

## K.     The Many Disputes Between The Parties

The completion of the Rescission Offer cleared the way for the real work of attempting to commercialize RU-486. In September 2000, the United States Food and Drug Administration approved RU-486 for sale in the United States.

By 2001, the disputes with Pike were resolved, and all of the financial obligations to Pike in the Settlement Agreement had been satisfied. There was no longer any possibility that Pike could claim breach and seek to reassert control. At that point, Mr. Hawkins asked Daniel to terminate the Irrevocable Proxy. Initially, Daniel demurred. He then told Mr. Hawkins that the Irrevocable Proxy was irrevocable and could not be relinquished.

Daniel's refusal to terminate the Irrevocable Proxy led to a series of lawsuits. In 2011, Daniel caused Holdings to sue Mr. and Mrs. Hawkins in the United States District Court for the Middle District of Tennessee (the "Tennessee Action"). In the Tennessee

---

[17] The Partnership receives 75% of 20% of the profits Danco Labs earns through the Partnership's ownership of the Majority Shares. 75% times 20% equals 15%. The Partnership receives 2.71% of the profits Danco Labs earns through the Partnership's ownership of a limited partner interest in Danco LP. 15% plus 2.71% equals 17.71%.

Action, Holdings asserted that Mr. and Mrs. Hawkins made misrepresentations that resulted in Daniel allowing them to transfer their interests in the Three Partnerships to other entities and avoid paying management fees they otherwise owed. *See MedApproach Hldgs., Inc. v. Hawkins*, 2012 WL 6569268, at \*1 (M.D. Tenn. Dec. 17, 2012). The parties later settled the case. *See MedApproach Hldgs., Inc., v. Hawkins*, Civ. No. 3:11-cv-01199, ECF No. 125 (M.D. Tenn. Oct. 11, 2016).

In 2013, while the Tennessee Action was still pending, Mrs. Hawkins sued Daniel and Holdings in the United States District Court for the Southern District of New York (the "New York Action"). In the New York Action, Mrs. Hawkins sought to invalidate the Irrevocable Proxy. She also asserted several unrelated claims regarding Daniel's management of the Three Partnerships. *See Hawkins v. MedApproach Hldgs., Inc.*, 2014 WL 3926811, at \*3 (S.D.N.Y. Aug. 11, 2014). In a series of decisions, the New York court dismissed or granted summary judgment in favor of Daniel for all of Mrs. Hawkins' claims, except a claim challenging Daniel's compensation in 2016 and 2017. That claim is not at issue in this case. *See generally Hawkins v. Daniel* (*Dismissal Decision*), 2021 WL 3732539, at \*7–8 (Del. Ch. Aug. 24, 2021).

## L. The Partnership Dissolves.

When Daniel formed the Partnership as part of the MedApproach Restructuring, he caused its internal affairs to be governed by an Agreement of Limited Partnership dated as of January 1, 1999. JX 15 (the "Partnership Agreement"). Section 2.7 of the Partnership Agreement provided that the term of the Partnership would expire on December 31, 2020.

24

*Id.* § 2.7. Section 9.1 of the Partnership Agreement provided that "[t]he Partnership shall terminate upon the expiration of its term." *Id.* § 9.1.

As the end of the Partnership term approached, Daniel asked the limited partners to extend its existence. Except for Mrs. Hawkins, the limited partners agreed to extend the term of the Partnership until 2045, consistent with the term of Danco LP.

As the holder of 88% of the limited partner interests, Mrs. Hawkins controlled the vote of the limited partners. Mrs. Hawkins agreed to extend the term of the Partnership until February 28, 2021, but not beyond. On that date, the Partnership dissolved.

Section 9.1 of the Partnership Agreement provides that after the Partnership dissolves, "no further business shall be done in the Partnership name except the completion of any incomplete transactions and the taking of such action as shall be necessary for the winding up of the affairs of the Partnership and the distribution of its assets." JX 15 § 9.1. Section 9.2 of the Partnership Agreement empowers Holdings, as general partner, to wind up the Partnership's affairs. As part of that process, Holdings is obligated to "convert to cash such of the noncash assets of the Partnership as [Holdings] deems necessary or advisable" and "determine the closing Capital Accounts of the Partners." *Id.* § 9.2.

## M. The Parties' Negotiations Over The Majority Shares

Mr. Hawkins initially did not think that he could buy the Majority Shares. By March 22, 2021, however, he had decided that he could. *See* G. Hawkins Tr. 110. He sent Daniel a letter proposing a price in the range of $12 to $15 million, contingent on the Majority Shares being sold "free and clear from, and not subject to," the Irrevocable Proxy. JX 36.

25

On March 25, 2021, Daniel responded that any offer would have to "take into account the terms of the [Irrevocable] Proxy." JX 37. The next day, Daniel sent a letter to the other limited partners in Danco LP asking whether they would be interested in purchasing some or all of the Majority Shares. JX 38; JX 39; Daniel Tr. 234. The only offer came from Rush, who offered $5 million for 80% of the Partnership's total assets based on the assumption that the Irrevocable Proxy would remain in place. Daniel Tr. 234–35. Rush's offer thus valued the Partnership at $6.125 million, approximately 50% lower than the bottom of Mr. Hawkins' range.

The discussions between Daniel and Mr. Hawkins went nowhere. Mr. Hawkins was not interested in purchasing the Majority Shares subject to the Irrevocable Proxy, and Daniel was not willing to discuss a sale free and clear of the Irrevocable Proxy.

## N.     This Litigation

On May 24, 2021, Mrs. Hawkins filed this litigation and moved for expedited proceedings. Dkt. 1. Her complaint asserts two counts.

In Count I, she sought a declaratory judgment that the defendants "are required to market and sell the Partnership's 75% stake in [Danco GP] free and clear from, and not subject to, the continued application of the [Irrevocable] Proxy." *Id.* ¶ 72. In Count II, she sought an injunction prohibiting the defendants "from marketing and/or selling the [Majority Shares] subject to the continued application of the [Irrevocable] Proxy." *Id.* ¶ 74.

The defendants opposed Mrs. Hawkins' request for expedited proceedings and argued that the court should dismiss this case in deference to the New York Action. Dkt.

26

6; Dkt. 7. Based on the allegations that Daniel was seeking to sell the Majority Shares, the court granted expedition. The court permitted the defendants to move for dismissal under the doctrine of *forum non conveniens* while the case otherwise moved forward. Dkt. 20.

Despite styling their motion as seeking dismissal under the doctrine of *forum non conveniens*, the defendants' briefs devoted one page to that topic. *See* Dkt. 16 at 19–20. Instead, the defendants argued that Mrs. Hawkins' complaint constituted improper claim splitting, relying on the existence of the New York Action. *Id.* at 16–19; Dkt. 23 at 5–7. The defendants also maintained that the plain language of the Irrevocable Proxy showed that the Majority Shares could not be transferred free and clear of the Irrevocable Proxy. Dkt. 16 at 20–22; Dkt. 23 at 7–12.

The court denied the defendants' motion. The court declined to address the defendants' arguments about the plain language of the Irrevocable Proxy because they had been advanced improperly. *Dismissal Decision*, 2021 WL 3732539, at *15.

After the denial of the defendants' motion to dismiss, the parties engaged in further discovery. The court held a one-day trial on September 23, 2021. At trial, Daniel agreed not to engage in any efforts to sell the Majority Shares until after the final disposition of this action, so post-trial briefing and argument unfolded on a non-expedited schedule.

## II.     LEGAL ANALYSIS

The principal issue for decision is whether the Irrevocable Proxy runs with the Majority Shares. This decision declares that the Irrevocable Proxy does not run with the

27

Majority Shares. This decision also holds that in a sale to an unaffiliated third party, the Partnership is not obligated to demand that the buyer bind itself to the Irrevocable Proxy.

The parties also have engaged on the scope of Daniel's fiduciary obligations when selling the Majority Shares. This decision does not reach this issue because it is not ripe for adjudication. A ruling addressing that issue would constitute an advisory opinion.

## A. Whether The Irrevocable Proxy Runs With The Majority Shares

Whether the Irrevocable Proxy runs with the Majority Shares depends on the language of the Irrevocable Proxy. *N. Fork Bancorporation, Inc. v. Toal*, 825 A.2d 860, 867–68 (Del. Ch. 2000), *aff'd sub nom. Dime Bancorp, Inc. v. N. Fork Bancorporation*, 781 A.2d 693 (Del. 2001). A proxy arrangement is a contract that creates an agency relationship. The owner of shares acts as principal to grant agency power to the proxyholder. The proxyholder agrees to exercise the authority conferred under the proxy arrangement in accordance with its terms and the proxyholder's fiduciary duties as agent.[18]

---

[18] *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1355 (Del. 1985) ("[I]t has long been recognized that the relationship between grantor and recipient of a proxy is one of agency . . . ."); *Duffy v. Loft, Inc.*, 151 A. 223, 227 (Del. Ch.) ("The paper writing which we call a proxy is nothing more than evidence of a relationship. . . . It simply testifies that A. has constituted B. his agent to act for him in a vicarious capacity."), *aff'd*, 152 A. 849 (Del. 1930); 2 David A. Drexler et al., *Delaware Corporation Law and Practice* § 25.09[2], at 25-20 (2020) ("[A] proxy is the creation of an agency . . . ."); 2 Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 212.03, at 7-55 (6th ed. Supp. 2020-1) (noting that under a proxy arrangement, "the stockholder is the principal and the proxy holder is the agent to vote the shares").

A proxy arrangement, however, does more than just create an agency relationship. From a corporate governance standpoint, it decouples the power to vote the shares from the economic interest in the shares. "For many years, Delaware decisions have expressed consistent concerns about transactions that create a misalignment between the voting interest and the economic interest of shares." *Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 388 (Del. 2010).

Delaware corporate law grants significant deference to the votes of disinterested stockholders.[19] Under the Delaware model, stockholders are presumed to vote in their economic interest. The outcome of a stockholder vote therefore aligns with the corporate goal of maximizing stockholder welfare. The maximizing of stockholder welfare in turn leads to the maximization of social welfare.

"What legitimizes the stockholder vote as a decision-making mechanism is the premise that stockholders with economic ownership are expressing their collective view as to whether a particular course of action serves the corporate goal of stockholder wealth maximization." *Kurz v. Holbrook*, 989 A.2d 140, 178 (Del. Ch. 2010), *aff'd in part, rev'd in part sub nom. Crown EMAK*, 992 A.2d 377. For that reason, the votes of interested

---

[19] *See, e.g.*, *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 312–13 (Del. 2015) ("[T]he long-standing policy of our law has been to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves.").

stockholders—those who face competing influences—do not count when a court considers whether to give effect to a disinterested stockholder vote.[20]

The concerns raised by decoupling voting power from ownership have implications for how a court applying Delaware law interprets a proxy arrangement. "Historically, proxies have been interpreted narrowly and when there is an ambiguity, read as not restricting the right to vote the shares." *TR Invs., LLC v. Genger* (*Genger Trial*), 2010 WL

---

[20] *Cf. Corwin*, 125 A.3d at 313–14 ("When the real parties in interest—the disinterested equity owners—can easily protect themselves at the ballot box by simply voting no, the utility of a litigation-intrusive standard of review promises more costs to stockholders in the form of litigation rents and inhibitions on risk-taking than it promises in terms of benefits to them. The reason for that is tied to the core rationale of the business judgment rule, which is that judges are poorly positioned to evaluate the wisdom of business decisions and there is little utility to having them second-guess the determination of impartial decision-makers with more information (in the case of directors) or an actual economic stake in the outcome (in the case of informed, disinterested stockholders)." (cleaned up)); *In re MFW S'holders Litig.*, 67 A.3d 496, 516–17 (Del. Ch. 2013) ("Under settled authority, the uncoerced, fully informed vote of disinterested stockholders is entitled to substantial weight under our law."), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014); *Kurz*, 989 A.2d at 179 (explaining that "the underlying economic interests of stockholders can be seen in multiple strands of our law," including "in provisions of Section 203 that exclude interested shares from the statutory votes to validate a transaction with an interested stockholder" and "[i]t justifies majority-of-the-minority votes and the judicially imposed requirement, not found in 8 *Del. C.* § 144(a)(2), that the statutory vote called for by that section come from disinterested shares"); *Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 663 n.34 (Del. Ch. 2013) ("[O]nly disinterested stockholder approval is a strong assurance of fairness."); *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 416 (Del. Ch. 2010) (explaining that "[e]conomic incentives matter, particularly for the effectiveness of a legitimizing mechanism like a . . . stockholder vote"); *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 900 (Del. Ch. 1999) ("Only votes controlled by stockholders who are not 'interested' in the transaction at issue are eligible for ratification effect in the sense of invoking the business judgment rule rather than the entire fairness form of review. That is, only the votes of those stockholders with *no* economic incentive to approve a wasteful transaction count." (footnotes omitted)).

2901704, at *20 (Del. Ch. July 23, 2010), *aff'd*, 26 A.3d 180 (Del. 2011). Phrased differently, a grant of proxy authority is "strictly construed." *Id.*

A proxy arrangement that purports to be irrevocable creates additional concerns, precisely because the principal gives up the power to terminate the agency relationship for the duration of the arrangement. If the proxyholder has divergent interests, then the resulting non-terminable separation of ownership from voting power becomes "mischievous in terms of its possible efficiency effects." *Haft v. Haft*, 671 A.2d 413, 422 (Del. Ch. 1995) (Allen, C.). The terms of an irrevocable proxy must therefore be plain and unambiguous. *Genger Trial*, 2010 WL 2901704, at *20.

These authorities call for departing from ordinary principles of contract interpretation when interpreting the Irrevocable Proxy.[21] The court necessarily begins with

---

[21] The above-the-line text articulates principles of Delaware law. A potentially important choice of law issue lurks in the background. To determine the law that governs a proxy arrangement, a court ordinarily looks to the law of the state of incorporation of the corporation whose shares are the subject of the arrangement. *See, e.g.*, 8 *Del. C.* § 212(b) (specifying requirements for proxy arrangement that can be used to vote shares in a Delaware corporation); Companies Law, § 22(1), Sched. 1, Table A §§ 57–60 (2016 rev.) (Cayman Is.) (specifying requirements for proxy arrangement that can be used to vote shares in a Cayman Islands company). This court has held that parties to a proxy arrangement involving the shares of a Delaware corporation can select the law of another jurisdiction to govern the arrangement, as long as there is a "material relationship" between the law selected and the subject of the agreement. *Genger Trial*, 2010 WL 2901704, at *21 n.143 (cleaned up). The Irrevocable Proxy selects the law of the State of California to govern its terms "[e]xcept to the extent required by the corporate or other provisions of the laws of the Cayman Islands." JX 5 § 3. When the Irrevocable Proxy was executed, Danco GP was chartered in the Cayman Islands, and its principal place of business was in New York. *Cf.* JX 10; JX 13. Pike was the owner of the Proxy Shares, and he lived in California.

31

its plain language, construing the agreement as a whole and giving effect to all its provisions. *See Fletcher v. Feutz*, 246 A.3d 540, 555 (Del. 2021). A court cannot apply the plain meaning of a contract if its language is ambiguous, so under ordinary principles of contract law, the court would look to extrinsic evidence. A court does *not* take that step when interpreting a proxy arrangement, and particularly not when interpreting an irrevocable proxy arrangement. Instead, the court construes the proxy strictly in favor of the rights of the owner of the shares and against the authority granted to the proxyholder. Put differently, any ambiguity is construed against the proxyholder. *See Genger Trial*, 2010

---

JX 6. The choice of California law (unless overridden by Cayman Islands law) was thus facially valid, and no one has offered a credible reason why it would not govern.

In litigating this case, however, the parties have relied almost entirely on Delaware law. They have taken a similar approach in other litigation over the Partnership. *Hawkins*, 2014 WL 3926811, at *5 n.2 (court in New York Action stating that "[a]s the parties' briefs assume that Delaware governs the statute of limitations and substantive law issues herein, the Court will apply it without a choice-of-law inquiry"); *accord Hawkins v. MedApproach Hldgs.*, Inc., 2020 WL 4349813, at *10 (S.D.N.Y. July 29, 2020) (same); *Hawkins v. MedApproach Hldgs., Inc.*, 2015 WL 8480076, at *2 (S.D.N.Y. Nov. 30, 2015) (same).

California appears to depart from Delaware law in a manner that would be more favorable to the plaintiff. Delaware law states generally that "[a] duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power." 8 *Del. C.* § 212(e). California law "enumerates certain specific instances sufficient to support the irrevocability of a proxy." Cal. Corp. Code § 705(e) Legis. Comm. cmt. e (West 1975). The Irrevocable Proxy is not supported by any of the enumerated instances.

This decision nevertheless follows the parties' lead and interprets the Irrevocable Proxy according to Delaware law.

32

WL 2901704, at *20 (explaining that Delaware courts apply a "presumption that irrevocable proxies should be narrowly construed").

These principles apply specifically to the contention that the Irrevocable Proxy runs with the Majority Shares such that it remains in effect even if a new stockholder acquires the Majority Shares. For a proxy arrangement to bind irrevocably not only the principal that creates it but also a subsequent principal, "the language of the Proxy itself" must "plainly indicate that the Proxy [is] to run with the [s]hares if they are sold." *Id.*

### 1. An Overview Of The Irrevocable Proxy

Both sides argue that the plain language of the Irrevocable Proxy supports their position. Mrs. Hawkins' argument is straightforward: The Irrevocable Proxy does not clearly state that it runs with the Majority Shares, and it fails to explicitly reserve any voting powers to the Holders after a sale of the Majority Shares. Accordingly, the Irrevocable Proxy does not run with the Majority Shares. *Genger*, 26 A.3d at 198.

Daniel responds by reading the Irrevocable Proxy as a whole. He points to various snippets of language, such as provisions addressing irrevocability, duration, and non-terminability. He reads those snippets broadly to argue that when construed together, they demonstrate that the Irrevocable Proxy runs with the Majority Shares. To support his position, Daniel often resorts to a series of assertions concerning the intent of the drafters of the Irrevocable Proxy. To that end, he claims that the Irrevocable Proxy was intended to

(i) transfer voting power over *all* of the shares in Danco GP,[22] (ii) create a durable and representative form of governance,[23] (iii) last as long as legally possible,[24] (iv) bind representatives and assigns,[25] and (v) include a mechanism so that the Holders could fix unclear terms.[26] His arguments tacitly concede that there is no provision in the Irrevocable Proxy which expressly states that it runs with the Majority Shares.

Analyzing the parties' arguments requires detailed consideration of the provisions of the Irrevocable Proxy. Before starting a long march through textual thickets, a birds' eye view of the landscape can be helpful. In broad strokes, the Irrevocable Proxy consists of a preamble with recitals, fifteen operative provisions, and the Addendum.

At a high level, the preamble and recitals establish definitions that are used throughout the Irrevocable Proxy. Most notably, they define the "Stockholder" who granted the Irrevocable Proxy solely as Pike. The recitals also provide some background that acts as a source of context. *See* JX 5 at 1.

The operative provisions detail the nature and extent of the agency relationship that the Irrevocable Proxy creates. For instance, the operative provisions state that Pike has

---

[22] *See, e.g.*, Dkt. 82 at 11 (citing JX 5 § 1).

[23] *See, e.g., id.* at 37 (citing JX 5 at 1, 5–6.).

[24] *See, e.g., id.* at 13 (citing JX 5 §§ 1, 5).

[25] *See, e.g., id.* at 36–37 (citing JX 5 § 15).

[26] *See, e.g., id.* at 36 n.29 (citing JX 5 § 9; *id.* at 6).

granted the Holders the authority to vote the Proxy Shares, a term that includes the Majority Shares. The operative provisions also dictate that the Holders will resolve any disagreements over how to vote the Proxy Shares by majority vote, and they restrict the Holders' ability to assign the rights they possess under the Irrevocable Proxy.

The Addendum appears after the signatures in the Irrevocable Proxy. Recall that the Settlement Agreement originally contemplated that all the Participating Investors would acquire the Majority Shares, including any limited partners in Danco LP who opted in. But to expedite that phase of the transaction, the LP Representatives pivoted to the Revised Settlement, in which only Old MedApproach acquired the Majority Shares. That change caused Popco to insist on a mechanism to bind Old MedApproach to the Irrevocable Proxy. In the Addendum, Old MedApproach agreed to be bound. The fact that the drafters included the Addendum provides powerful evidence against Daniel's argument that the Irrevocable Proxy runs with the Majority Shares. If it did, there would not have been any need for the Addendum.

Having provided a high-level summary, this decision now works through the language of the Irrevocable Proxy in detail. To preview the conclusion, the plain language of the Irrevocable Proxy does not establish a grant of agency authority that runs with the Majority Shares. At best for Daniel, the Irrevocable Proxy contains language that might support such a reading if read broadly, but which is ultimately ambiguous. Under the special principles of contract interpretation that apply to proxy arrangements, any

ambiguity is interpreted against a grant of authority. That in turn means that the Irrevocable

Proxy does not establish a grant of agency authority that runs with the Majority Shares.

## 2.    The Preamble And The Recitals

Initially, both sides rely on the preamble and recitals to support their competing

positions. Although the preamble and recitals are not substantive provisions, they contain

important definitions and provide relevant background.[27]

The preamble in the Irrevocable Proxy states:

> THIS IRREVOCABLE PROXY, dated as of February 5, 1997 is entered into
> by and between Joseph D. Pike (the "Stockholder"), in favor of each of [the]
> individuals [Daniel, Freeman, and Rush] set forth on Exhibit A attached
> hereto (each a "Holder" and collectively, the "Holders").

JX 5 at 1.

For present purposes, the most important aspect of the preamble is the definition of

"Stockholder." It only references Pike. It does not include language defining the

"Stockholder" to include subsequent holders of the Majority Shares.

The preamble is followed by the first recital, which states:

> WHEREAS, as of the date hereof, the Stockholder is the sole beneficial
> owner of an aggregate of 100 shares (the "Shares") of the Common Stock,
> $1.00 par value of [Danco GP], a corporation organized and existing under

---

[27] *Urdan v. WR Cap. P'rs, LLC*, 2019 WL 3891720, at *15 (Del. Ch. Aug. 19, 2019), *aff'd*, 244 A.3d 668 (Del. 2020); *accord Fletcher*, 246 A.3d at 555; *Llamas v. Titus*, 2019 WL 2505374, at *16 (Del. Ch. June 18, 2019); *see also* 17A Am. Jur. 2d *Contracts* § 373, Westlaw (database updated Feb. 2022) ("'Whereas clauses' are generally viewed as being merely introductory and since recitals indicate only the background of a contract, that is, the purposes and motives of the parties, they do not ordinarily form any part of the real agreement." (footnote omitted)).

the laws of the Cayman Islands (the "Company") which shares are held of record by Cardinal Investments Limited for the benefit of Stockholder.

*Id*.

For present purposes, the most important aspect of the first recital is the definition of the "Shares." To support his reading of the Irrevocable Proxy as a permanent corporate governance arrangement, Daniel asserts that the definition of "Shares" should be understood as encompassing all of the shares of Danco GP. Daniel must take this position, because otherwise it would be possible to alter the corporate governance arrangement and sell control of Danco GP simply by increasing the authorized number of shares of Danco GP and issuing shares to a new owner. Daniel therefore makes the historically accurate observation that when the Irrevocable Proxy was executed, Danco GP had (and continues to have) only 100 shares, and Pike owned all of them.

While that fact is true, it is irrelevant for purposes of interpreting the definition. The plain language of the definition states that the "Shares" are those 100 shares that "the Stockholder is the sole beneficial owner of." They are thus the "Shares" that were owned by Pike at the time he executed the Irrevocable Proxy.

Daniel also relies on the second recital, which states as follows:

WHEREAS, this Irrevocable Proxy is being entered into pursuant to the terms of that certain Agreement Regarding Neogen Project (the "[Settlement] Agreement"), dated as of January 21, 1997, as amended by Addendum of even date, between Stockholder, the Holders and certain other limited partners of [the predecessor to Danco LP] . . . .

*Id.* This recital is best read in conjunction with the third recital, which states:

37

> WHEREAS, pursuant to the [Settlement Agreement], 75 of the Shares are being transferred by Stockholder to MedApproach L.P. ("[Old] MedApproach") and Stockholder will retain beneficial ownership of 25 Shares.

*Id.* Daniel correctly interprets these recitals as memorializing that the Irrevocable Proxy was part of the business deal initially documented in the Settlement Agreement and implemented through the Revised Settlement. He then argues that the Settlement Agreement contemplated a permanent corporate governance arrangement for the Project and that the Irrevocable Proxy implemented that permanent corporate governance arrangement.

The record evidence indicates that the Irrevocable Proxy served a related but different purpose. As discussed in the Factual Background, Popco wanted Pike to give up any and all control of the Project as soon as possible. The Settlement Agreement, however, contemplated a complex series of transactions that would take time to implement. The solution was the Irrevocable Proxy, under which Pike immediately gave up his voting power over the Proxy Shares. The Irrevocable Proxy was intended to bridge the gap to a more permanent corporate governance solution, which the parties envisioned would involve a more typical governance structure.

Finally, the fourth recital reiterates the linkage between the Irrevocable Proxy and the Settlement Agreement. It states:

> WHEREAS, this Irrevocable Proxy is being executed and delivered by the Stockholder in order to induce the Participating Investors (as defined in the [Settlement] Agreement) to perform certain obligations, including, without limitation, the advance to [Pike] by [Old] MedApproach of certain monies

and the incurring by the Participating Investors of certain financial obligations to [Danco LP].

JX 5 at 1. This recital acknowledges that the execution of the Irrevocable Proxy was an inducement so that the Participating Investors would take on certain obligations described in the Settlement Agreement.

Daniel argues that the Participating Investors relied and continue to rely on the existence of the Irrevocable Proxy as referenced in the fourth recital, but Daniel's argument is unpersuasive. The recital links any reliance by the Participating Investors to the obligations they undertook under the Settlement Agreement. At this point, all of those obligations have been fulfilled. In addition, as described in the Factual Background, there ended up being only three Participating Investors: Old MedApproach, Freeman, and Rush. Old MedApproach dissolved in the MedApproach Restructuring, and Freeman is no longer alive. Only Rush remains, and despite being aware of this proceeding and aligned with Daniel, he is not a party.

As this discussion shows, there is nothing in the preamble or recitals standing alone that would suggest the Irrevocable Proxy runs with the Majority Shares. The preamble and recitals provide informative definitions and background, but they show only that Pike granted the Irrevocable Proxy pursuant to the Settlement Agreement, that Pike (and only Pike) granted voting authority over the Proxy Shares, and that the Irrevocable Proxy applied to all of the shares that Pike owned.

### 3. The Operative Provisions

Next, the parties debate whether a series of operative provisions in the Irrevocable Proxy cause it to run with the Majority Shares. None of the operative provisions plainly provide for that result. At best for Daniel, certain operative provisions could be read broadly to support that result. Under the interpretative framework that governs a proxy relationship, that is not enough. The plain language of the Irrevocable Proxy must make clear that the grant of authority runs with the Majority Shares. The Irrevocable Proxy does not do that. Instead, the parties entered into the Addendum to ensure that the Irrevocable Proxy would bind the one subsequent owner that they knew about—Old MedApproach.

### a. The Appointment Provision

The first operative provision that the parties rely on is, appropriately enough, Section 1 of the Irrevocable Proxy. Forming the heart of the proxy relationship, Section 1 is the provision by which Pike appointed each Holder as his proxy with authority to vote the Proxy Shares during the term of the Irrevocable Proxy. The relevant language states:

> The Stockholder hereby constitutes and appoints each Holder, during the term of this Irrevocable Proxy, as the Stockholder's true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all of the Shares plus any additional Shares which Stockholder may own or hold as of the date of any such vote (and any all [sic] securities issued or issuable in respect thereof) which Stockholder is entitled to vote (collectively, the "Proxy Shares"), for and in the name, place and stead of the Stockholder, at any annual, special or other meeting of the stockholders of the Company, and at any adjournment or postponement thereof, or pursuant to any consent in lieu of a meeting or otherwise.

*Id.* § 1 (the "Appointment Provision").

The Appointment Provision thus creates the agency relationship between the Stockholder and each Holder. To be effective as a proxy, a "document must appoint someone to vote the shares," *Lobato v. Health Concepts IV, Inc.*, 606 A.2d 1343, 1347 (Del. Ch. 1991), and "identify the shares to be voted by the agent," *Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999). The Appointment Provision appoints "each Holder" as the "someone to vote the shares" and identifies the Proxy Shares as the "shares to be voted."

Mrs. Hawkins argues that the terms of the Appointment Provision demonstrate that the Irrevocable Proxy does not create a proxy relationship that runs with the shares. She relies on a decision in which Chief Justice Strine, while serving as a Vice Chancellor, held that the plain language of a proxy did not "plainly indicate that the Proxy was to run with Shares" if sold. *Genger Trial*, 2010 WL 2901704, at \*20. Instead, Chief Justice Strine noted that the "[t]he explicit terms of the Proxy establish that it only applies so long as the [stockholder] Sagi Trust owns the Shares." *Id.*

In reaching this conclusion, Chief Justice Strine relied on appointment language that only referenced the stockholder who owned the shares at the time, rather than extending to subsequent owners, and which only empowered the proxyholders to vote to the extent the stockholder would be entitled to do so. He reasoned:

> For example, the Proxy states that the Sagi Trust appoints [the proxyholder] "to vote as *its* proxy, all shares of common stock of TRI which are not or hereafter *owned by the Trust*." Also, it permits [the proxyholder] to vote only "in the same manner and to the same extent as *the Trust* might, were *the Trust* present at said meeting." In this regard, the Proxy is different, for example, from the proxy at issue in *Haft v. Dart Group Corp.*, which gave the proxy holder the "right to exercise all rights to vote the Shares on all matter on which they are entitled to vote." Here, the Proxy does not give [the

41

> proxyholder] the right to vote on all matters in which the Sagi Shares are entitled to vote; rather, the Proxy gives Genger the right to vote on all matters in which the Sagi Trust is entitled to vote, suggesting that the Proxy does not extend to subsequent owners of the Shares.

*Id.* (footnotes omitted). Relying on the same proxy language, the Delaware Supreme Court affirmed the trial court's decision, finding that "the Proxy's plain language defeats [the proxyholder's] position." *Genger*, 26 A.3d at 198.

Mrs. Hawkins correctly observes that the Appointment Provision closely resembles the grant of authority in *Genger Trial*. The critical language in that case granted the proxyholder the authority to "to vote as *its* proxy, all shares of common stock of TRI which are [now] or hereafter *owned by the Trust*" and to do so "in the same manner and to the same extent as *the Trust* might, were *the Trust* present at said meeting." *Genger Trial*, 2010 WL 2901704, at *20. Here, the Appointment Provision empowers each Holder to vote as "*the Stockholder's* true and lawful proxy." JX 5 § 1 (emphasis added). It likewise grants each Holder the authority "to vote all of the Shares plus any additional Shares which *Stockholder may own or hold* as of the date of any such vote" and "which *the Stockholder* is entitled to vote . . . for and in the name, place and stead of *the Stockholder*." *Id.* (emphasis added).

Daniel seeks to distinguish *Genger Trial* by arguing that the Appointment Provision grants proxy authority as to *all* shares of Danco GP, not just the shares owned by the Stockholder. That argument misreads the plain language of the Irrevocable Proxy. As noted, the first recital defines the "Shares" as the 100 shares of Danco GP stock in which "the Stockholder is the sole beneficial owner." JX 5 at 1. The Appointment Provision grants

42

the Holders the authority to vote the 100 shares of Danco GP that the Stockholder owned at the time plus any additional shares that the Stockholder owns or holds as of the date of a given vote. Although it was historically true that when Pike executed the Irrevocable Proxy he owned all of the shares of Danco GP, the Irrevocable Proxy does not frame the grant of authority as extending to all of the shares of Danco GP. The Irrevocable Proxy speaks in terms of the shares that Pike owned plus any additional shares that he might own on the date of the vote in question.

Daniel's effort to distinguish *Genger Trial* and argue that the Irrevocable Proxy extends to subsequent owners of the Majority Shares also runs afoul of language in the Appointment Provision that only grants the Holders authority to vote the Proxy Shares in "the name, place and stead of the Stockholder." In *Genger Trial*, Chief Justice Strine interpreted similar language as suggesting that the proxy "does not extend to subsequent owners of the Shares." *Genger Trial*, 2010 WL 2901704, at *20. The same reasoning applies here. By only authorizing the Holders to vote the Proxy Shares in "the name, place and stead of the Stockholder," the language of the Irrevocable Proxy suggests that the grant of authority does not extend to subsequent owners of the Proxy Shares, including the Majority Shares.

There is no language in the Appointment Provision that would suggest that the grant of authority would bind subsequent owners. That absence is telling, because the Appointment Provision is the operative provision that creates the agency relationship. If the parties intended to establish an agency relationship that would bind subsequent owners,

43

then the Appointment Provision would be a logical place to include the operative language. This decision has already pointed out that the Irrevocable Proxy does not include language to that effect in the definition of "Stockholder." The Appointment Provision does not contain that language either.

### b. The Irrevocability Provision

In addition to the Appointment Provision, Section 1 of the Irrevocable Proxy contains language that (i) establishes that the Irrevocable Proxy is indeed irrevocable and (ii) delineates the duration of the grant of authority. The relevant language states:

> All power and authority hereby conferred is coupled with an interest and is irrevocable. In the event any applicable law imposes a mandatory limit on the period of time for which a proxy or other rights as referenced herein may be granted, it is the intention of the parties that this Irrevocable Proxy and the related rights granted herein shall expire on the latest date permissible under such applicable law, and the parties hereto hereby waive any such time limitation to the fullest extent waivable and hereby extend and/or agree to extend such time limit (by amendment, renewal or otherwise) to the fullest extent extendable under such law.

JX 5 § 1 (the "Irrevocability Provision"). Daniel argues that by making the Irrevocable Proxy irrevocable and providing for the maximum duration permitted by law, the Irrevocability Provision demonstrates that the Irrevocable Proxy runs with the Majority Shares. Daniel's analysis conflates three different concepts: irrevocability, duration, and running with the shares.

The first concept is irrevocability, which concerns whether the grantor of the proxy can revoke it. "Most agency powers are, of course, terminable by the grantor of the power at will" *Haft*, 671 A.2d at 420. The exception is when the grant of agency authority is

44

"coupled with an interest." 12 Williston on Contracts § 35:32 (4th ed.), Westlaw (database updated Nov. 2021). Consistent with that common law rule, Section 212(e) of the Delaware General Corporation Law (the "DGCL") states: "A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power." 8 *Del. C.* § 212(e).

The first sentence of the Irrevocability Provision tracks the statutory requirements under Section 212(e), thereby making the Irrevocable Proxy irrevocable. Making a proxy irrevocable only means that the grantor of the proxy cannot revoke it during the term of the proxy. Standing alone, the act of making a proxy irrevocable does not say anything about the duration of the proxy or whether it will run with the shares.

The second concept is the duration of the proxy, which means how long the proxy arrangement lasts. Under Section 212(b) of the DGCL, a proxy may not be "voted or acted upon after 3 years from its date, unless the proxy provides for a longer period." 8 *Del. C.* § 212(b). A grantor thus can create a proxy with a longer or shorter duration, but the default period under Delaware law is three years.

The second sentence of the Irrevocability Provision makes the term of the Irrevocable Proxy as long as permitted under applicable law. Standing alone, the act of establishing a duration for a proxy does not say anything about whether it is irrevocable or whether it will run with the shares. It only says how long the proxy will last.

The third concept, which the Irrevocability Provision does not address, is whether the grant of proxy authority will bind a subsequent owner. A proxy might be revocable and

hence terminable at will, and yet run with the shares until terminated. Or a proxy might only grant agency authority for thirty days, but run with the shares during that period. Or a proxy might be irrevocable and not run with the shares. As these examples show, whether the proxy runs with the shares is a different issue than irrevocability and duration.

Daniel relies on the language of the Irrevocability Provision to contend that the parties intended for the Irrevocable Proxy to be a permanent governance arrangement that would bind subsequent owners of the Majority Shares. That is not what the language says. The Irrevocability Provision makes clear that the Irrevocable Proxy was intended to be irrevocable. The Irrevocability Provision also addresses the duration of the Irrevocable Proxy, and it contracts out of the three-year default limitation period that would apply under Delaware law. As a result of this language, Pike could not seek to revoke the Irrevocable Proxy as long as it was coupled with a sufficient interest, and he could not claim that the Irrevocable Proxy had expired. But the Irrevocability Provision did not address what would happen if Pike transferred the Majority Shares. The Irrevocability Provision remains silent on that topic.

### c.    The Termination Provision

The next operative provision is Section 4, which identifies two scenarios when the Irrevocable Proxy will terminate. The operative language states:

This Irrevocable Proxy shall terminate immediately upon the occurrence of any of the following:

(i)    the merger or other reorganization of the Company in connection with the formation of "Newco" as contemplated in the [Settlement] Agreement, but only if and to the extent the terms and conditions of

46

> the documentation pursuant to which such merger or other reorganization is effected expressly refer to this Irrevocable Proxy and expressly provide that this Irrevocable Proxy shall terminate pursuant to such documents; or
>
> (ii)  upon notice of termination given by the Holders to the Stockholder.

JX 5 § 4 (the "Termination Provision") (formatting added). Daniel argues that by identifying only limited circumstances in which the Irrevocable Proxy terminates, the Termination Provision establishes the *only* circumstances in which the Irrevocable Proxy can terminate. As a result, Daniel argues that the Irrevocable Proxy must otherwise be permanent and run with the Majority Shares.

As with his arguments about the Irrevocability Provision Daniel's argument about the Termination Provision conflates different concepts. This time, the distinct concepts are termination and running with the shares. While the Termination Provision makes clear that there are two specific circumstances where the Irrevocable Proxy terminates, it does not address what would happen if the Majority Shares were transferred to a subsequent owner.

On top of that, both aspects of the Termination Provision conflict with Daniel's contention that the Irrevocable Proxy created a permanent corporate governance arrangement. The Termination Provision envisions that the Irrevocable Proxy will terminate upon the reorganization of Danco GP and the formation of Newco as contemplated by the Settlement Agreement. That concept referred to the plan to collapse the complex entity structure that Pike had created and replace it with a more conventional corporate governance scheme. The contemplated termination of the Irrevocable Proxy in

47

connection with the restructuring indicates that the Irrevocable Proxy was not intended to be a permanent arrangement. It was an interim measure.

The Termination Provision also contemplates that the Holders can terminate the Irrevocable Proxy. An agent may always terminate an agency relationship, although the agent may incur liability for doing so if the agent breaches the terms of the agency agreement.[28] A proxyholder is an agent, so the same rule applies. Welch, *supra*, § 212.03, at 7-57. The Termination Provision makes clear that the Holders could terminate the Irrevocable Proxy without breaching its terms.

Two aspects of the Holders' termination right merit emphasis, one specific and one general. As to the first, the specific language of the provision speaks in terms of the Holders giving notice to "the Stockholder." As discussed previously, the Stockholder was Pike, and there is no language associated with the definition of "Stockholder" which suggests that the Irrevocable Proxy would run with the Majority Shares. As to the second, the general existence of the Holders' termination right demonstrates that the Irrevocable Proxy was not a permanent governance measure. The Holders could terminate the Irrevocable Proxy

---

[28] *See* 2A C.J.S. *Agency* § 123, Westlaw (database updated Mar. 2022) ("Although the agent possesses the power to renounce the agency at any time, his or her right to do so is dependent upon the nature and terms of the agreement creating the agency."); Restatement (Third) of Agency § 3.10 (Am. Law. Inst. 2006), Westlaw (database updated Mar. 2022) (explaining that "the agent has power to renounce" its actual authority but exercising that power "may constitute a breach of contract").

if there was no longer any need for it, such as after the obligations set forth in the Settlement Agreement were fulfilled.

The Termination Provision thus deals with termination. It does not address whether the Irrevocable Proxy runs with the shares.

### d. The Non-Termination Provision

The next operative provision is Section 5, which reinforces the Irrevocability Provision and the Termination Provision. It states:

> The Stockholder agrees that such Irrevocable Proxy is coupled with an interest sufficient in law to support an irrevocable power and shall not be terminated by any act of the Stockholder (other than in connection with the termination provisions of Section 4 hereof), by death or disability of the Stockholder, by lack of appropriate power or authority or by the occurrence of any other event or events other than as provided in Section 4 hereof.

JX 5 § 5 (the "Non-Termination Provision").

Daniel argues that the Non-Termination Provision prevents the Stockholder from terminating the Irrevocable Proxy except as contemplated by the Termination Provision, and he contends that this provision prevents the Stockholder from terminating the Irrevocable Proxy by selling the Majority Shares. Therefore, he says, the Irrevocable Proxy must run with the Majority Shares. That is one possible reading, but it requires that the court read the provision broadly to infer that it extends to a transfer of shares when there is no language that speaks to a transfer. Read in context and against the backdrop of the common law, the more natural reading is that the Non-Termination Provision confirms that the Stockholder cannot terminate the Irrevocable Proxy while owning the Majority Shares.

49

The provision does not say anything about whether the Irrevocable Proxy binds a subsequent owner.

The Non-Termination Provision is largely confirmatory of other sections of the Irrevocable Proxy. The first clause in the Non-Termination Provision repeats that the Irrevocable Proxy is coupled with an interest, but this time the language is framed as the Stockholder's agreement to that effect. As discussed, by stating that a proxy is irrevocable and coupling it with an interest, the grantor makes the relationship non-terminable for as long as the proxy remains in effect and a sufficient interest exists. 8 *Del. C.* § 212(e).

The Non-Termination Provision then identifies specific situations in which the Stockholder agrees that the Irrevocable Proxy will not terminate. Those situations track aspects of the common law, with each identifying a situation in which an agency relationship generally terminates, but an agency relationship that is coupled with an interest does not terminate. The Restatement (Third) of Agency spells out these principles, explaining that unless otherwise agreed, "neither a power given as security nor a proxy made irrevocable"[29] will be terminated by

> (a) a manifestation revoking the power or proxy made by the person who created it; or

---

[29] Section 3.13 of the Restatement often discusses the termination of a power given as security and the termination of an irrevocable proxy in tandem. This decision includes quotations that refer to both concepts, so it bears emphasizing that the Restatement plainly distinguishes between a power given as security and an irrevocable proxy. *Compare* Restatement (Third) of Agency, *supra*, § 3.12(1), *with id.* § 3.12(2). The two concepts establish different legal relationships.

(b) surrender of the power or proxy by its holder if it is held for the benefit of another person, unless that person consents; or

(c) loss of capacity by the creator or the holder of the power or proxy; or

(d) death of the holder of the power or proxy, unless the holder's death terminates the interest secured or supported by the power or proxy; or

(e) death of the creator of the power or proxy, if the power or proxy is given as security for the performance of a duty that does not terminate with the death of its creator.[30]

The Non-Termination Provision tracks categories (a), (c), and (e) of the Restatement. The Non-Termination Provision thus reflects a common contractual practice of memorializing default principles of common law, ideally so there will be less argument about them. The fact that the Non-Termination Provision mirrors the common law rules indicates that it is not a bespoke provision designed to make the Irrevocable Proxy run with the Majority Shares.

### i. "Any Act Of The Stockholder"

Daniel insists that the language prohibiting termination of the Irrevocable Proxy by "any act of the Stockholder" extends to a sale of the Majority Shares. He reasons that selling the shares is an "act of the Stockholder" and hence cannot effect a termination. That

---

[30] Restatement (Third) of Agency, *supra*, § 3.13(2); *see* Williston, *supra*, § 35:32 ("Unless there is an agreement to the contrary between the parties, the authority or power of an agent, when coupled with an interest, is generally not revocable by the act, condition, or death of the principal before the expiration of the interest."); 3 Am. Jur. 2d *Agency* § 56, Westlaw (database updated Feb. 2022) ("Where the authority or power of an agent is coupled with an interest, it is not revocable by the act, condition, or death of the principal before the expiration of the interest unless there is some agreement to the contrary between the parties.").

is one possible reading. The better reading is that the concept of an "act of the Stockholder" encompasses acts that the principal might take to terminate the agency relationship while remaining the owner of the Majority Shares.

As discussed above, the language of the Non-Termination Provision closely tracks the common law concepts in Section 3.13 of the Restatement. That section provides that an irrevocable agency arrangement cannot be terminated by "a manifestation revoking the power or proxy made by the person who created it." Restatement (Third) of Agency, *supra*, § 3.13(2)(a). The reference to "any act of the Stockholder" reframes that common law precept.

Daniel's interpretation of the phrase "any act of the Stockholder" conflicts with the Restatement, which describes three situations where "irrevocable proxies will always terminate." *Id.* § 3.13 cmt. b. In the language of the Restatement, "[a] power given as security or an irrevocable proxy is terminated by an event" that

    (a) discharges the obligation secured by the power or terminates the interest
        secured or supported by the proxy, or

    (b) makes its execution illegal or impossible, or

    (c) constitutes an effective surrender of the power or proxy by the person for
        whose benefit it was created or conferred.

*Id.* § 3.13(1).

Absent specific and explicit language to the contrary, a sale of the shares that are the subject of an irrevocable proxy operates to terminate the proxy under category (b). "When a share of stock is sold, the property rights associated with the shares," including

the right to vote the shares, "travel with the shares." *See In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1050 (Del. Ch. 2015). After a sale, the grantor no longer has the right to vote the shares that are the subject of the proxy. Instead, the right belongs to the subsequent owner. The proxyholder cannot exercise the grantor's right to vote because the grantor no longer possesses that right. Consequently, absent specific and express language to the contrary, an irrevocable proxy terminates "when it is no longer possible for the proxyholder to vote because the grantor of the proxy no longer owns the securities or membership interest." Restatement (Third) of Agency, *supra*, § 3.13 cmt. b. Only if the purchaser both knows about an irrevocable proxy *and* the irrevocable proxy contains plain and unambiguous language binding a subsequent owner will the purchaser acquire the shares subject to the irrevocable proxy. *Id.*[31]

---

[31] Some states have altered the common law rule by statute. In those states, an irrevocable proxy binds a purchaser of the shares who has notice of the proxy, even without specific language binding a subsequent owner. *See, e.g.*, Cal. Corp. Code § 705(f) ("To protect a purchaser of shares subject to an irrevocable proxy who is without knowledge of the existence of the proxy, this subdivision provides that such a purchaser may revoke the proxy unless the existence of the proxy and its irrevocability appears on the certificate representing such shares."); N.Y. Bus. Corp. Law § 609(g) (McKinney 1998) ("A proxy may be revoked, notwithstanding a provision making it irrevocable, by a purchaser of shares without knowledge of the existence of the provision unless the existence of the proxy and its irrevocability is noted conspicuously on the face or back of the certificate representing such shares."); Tex. Bus. Orgs. Code Ann. § 21.370(b) (West 2006) (making irrevocable proxy enforceable against transferee unless transferee lacked "actual knowledge of the existence of the irrevocable proxy at the time of the transfer"). The Model Business Corporation Act contains language to that effect: "Unless it otherwise provides, an appointment made irrevocable under subsection (d) continues in effect after a transfer of the shares and a transferee takes subject to the appointment, except that a transferee for value of shares subject to an irrevocable appointment may revoke the appointment if the transferee did not know of its existence when acquiring the shares and the existence of the

Against the backdrop of these common law rules, the reference to "any act of the Stockholder" necessarily refers to any act the stockholder takes while still the owner of the Majority Shares. It would require additional language to override the default rule in the Restatement, under which the Irrevocable Proxy terminates upon a sale of the Majority Shares. The general statement that "any act of the Stockholder" does not terminate the Irrevocable Proxy is not enough to override the default rule. The parties plainly understood this, because they entered into the Addendum to bind Old MedApproach to the Irrevocable Proxy after the purchase of the Majority Shares.

In the abstract and read in isolation, the phrase "any act of the Stockholder" is susceptible to two meanings. Read against the backdrop of the default common law rules concerning scenarios when irrevocable proxies terminate, given the presence of the Addendum, and without any explicit reference in the Non-Termination Provision to a sale of the Majority Shares, only Mrs. Hawkins' reading is persuasive. Regardless, for purposes

irrevocable appointment was not noted conspicuously on the certificate representing the shares or on the information statement for shares without certificates." MBCA § 7.22(g). Under the common law, a similar rule applies to a power given as security, but not to an irrevocable proxy, which terminates "when it is no longer possible for the proxy holder to vote because the grantor of the proxy no longer owns the securities." Restatement (Third) of Agency, *supra*, § 3.13 cmt. b. The DGCL does not contain a similar provision overriding the common law rule as to an irrevocable proxy. Consequently, as described in the text, an irrevocable proxy generally terminates when the grantor transfers the shares, and a subsequent owner only acquires the shares subject to the irrevocable proxy if the subsequent owner both knew about the irrevocable proxy at the time of the purchase and the irrevocable proxy contained express and unambiguous language causing the proxy to bind a subsequent owner.

of the Irrevocable Proxy, the presence of ambiguity alone is sufficient to defeat Daniel's argument. The reference in the Non-Termination Provision to "any act of the Stockholder" does not cause the Irrevocable Proxy to run with the Majority Shares.

### ii. "Death Or Disability Of The Stockholder"

Next, Daniel focuses on the reference in the Non-Termination Provision to "death or disability" not terminating the Irrevocable Proxy. He correctly observes that that because of this language, after Pike died, the Irrevocable Proxy would continue to govern the shares that Pike owned at his death even though those shares would have passed to his estate. Daniel contends that for an entity, dissolution and cancellation are the equivalents of civil death, and because the Partnership currently owns the Majority Shares, the language about "death or disability" should be construed to provide that the Irrevocable Proxy will bind any subsequent owner of the Majority Shares who acquires them in the winding up process.

There are multiple difficulties with Daniel's reading. First, death is not the same as dissolution. Read literally, the Irrevocable Proxy does not address what happens upon the dissolution. This omission is significant, because when the parties drafted the Irrevocable Proxy, they anticipated that Old MedApproach would acquire the Majority Shares, and they could have drafted the Non-Termination Provision to address events in the life of an entity. They did not.

Second, the reference to "death or disability" tracks the common law concepts framed in Sections 3.13(2)(c) and (e) of the Restatement. Section 3.13(2)(c) addresses what happens when the principal loses the capacity to designate an agent, which corresponds to

the reference to disability. Section 3.13(2)(e) addresses what happens when the principal dies, which corresponds to the reference to death. The references to death and disability deal with events affecting the principal's capacity to empower an agent. They do not deal with a transfer of the property that otherwise would remain the subject of the agency relationship. The common law rules articulated in the Restatement provide that an irrevocable proxy terminates when the shares that are subject to the irrevocable proxy are sold. And for good reason, because after the sale, the principal no longer owns the shares and does not have the right to vote them. Therefore, after a sale, even a competent and living principal can no longer grant authority to an agent to vote those shares. Restatement (Third) of Agency, *supra*, § 3.13 cmt. b.

The clear distinction between the consequences of death or disability and the consequences of a sale mean that the reference to "death or disability" in the Irrevocable Proxy does not cause the Irrevocable Proxy to run with the Majority Shares. Recognizing that fact, the parties added the Addendum to bind Old MedApproach.

Daniel's interpretation of the reference to "death or disability" is not reasonable. At a minimum, it is not possible to read the reference to "death or disability" as plainly providing that the grant of proxy authority runs with the Majority Shares. The language must be construed against the grant of authority.

### iii. "Any Other Event Or Events"

Finally, Daniel relies on the language in the Non-Termination Provision which states that the Irrevocable Proxy will not terminate by "the occurrence of any other event

56

or events other than as provided in Section 4 hereof." Daniel claims that this language necessarily includes a sale of the Majority Shares, which he construes as an "other event."

This aspect of the Non-Termination Provision is plainly intended as a catch-all. Its language is subject to at least two interpretations. One is that it encompasses anything the Stockholder might do while owning the Majority Shares, short of selling the Majority Shares. Another is that it encompasses anything the Stockholder might do, including selling the Majority Shares.

In the abstract, both readings are reasonable. Considered against the backdrop of the common law rules, in the presence of the Addendum, and in the absence of any reference to a transfer of the Majority Shares, only the former reading is reasonable. The reference to "any other event" only applies to events that occur while the Stockholder owns the Majority Shares. It does not encompass a sale of the Majority Shares.

As with the other aspects of the Non-Termination Provision, it is enough that this aspect of the Irrevocable Proxy does not expressly address a sale of the Majority Shares. It is not possible to read the reference to "any other event" as plainly providing that the grant of proxy authority runs with the Majority Shares.

### e. The Assignment Provision

The march through the Irrevocable Proxy continues with a provision addressing the extent to which the rights granted under the Irrevocable Proxy could be assigned (the "Assignment Provision"). If the drafters had intended to include language providing that the Irrevocable Proxy would run with the Majority Shares, then the Assignment Provision

57

is another likely place for it to appear. As with other aspects of the Irrevocable Proxy, however, the Assignment Provision does not clearly provide for the Irrevocable Proxy to run with the Majority Shares.

The Assignment Provision states:

This Irrevocable Proxy and the rights of the Holders under this Irrevocable Proxy may not be assigned, except that (a) any Holder may, with the consent of the remaining Holders, transfer such Holder's rights to any person who is, or is affiliated with, a limited partner of the Partnership, and (b) the Holders may act pursuant to this Irrevocable Proxy, in voting the Proxy Shares or otherwise, through any duly authorized officer or employee of the Company. This Irrevocable Proxy shall be binding upon and inure to the benefit of Stockholder and the Holders and their respective heirs, devises, legatees, personal representatives, agents and permitted assigns.

JX 5 § 15. The Assignment Provision thus has three parts. It starts with a blanket prohibition on any assignment of either the Irrevocable Proxy as a whole or any of the rights that the Holders received under the Irrevocable Proxy (the "No-Assignment Clause"). It then creates two exceptions to the No-Assignment Clause, each of which identifies a circumstance in which the Holders could assign their rights (the "Holder Exceptions"). Finally, it ends with a sentence identifying who benefits from and will be bound by the Irrevocable Proxy (the "Bound Parties Clause"). As with the other provisions of the Irrevocable Proxy, there is no language in the Assignment Provision that expressly provides for the Irrevocable Proxy to run with the Majority Shares, but some of the language in the Assignment Provision comes close.

The No-Assignment Clause establishes the following general rule: "This Irrevocable Proxy and the rights of the Holders under this Irrevocable Proxy may not be

58

assigned." *Id.* By default under the common law, contract rights and other property rights are freely alienable.[32] The right to vote the Proxy Shares is a contract right associated with the shares. *Activision*, 124 A.3d at 1049 (explaining that the right to vote is a "classic example[]" of a contract right associated with shares). Through the Irrevocable Proxy, the Stockholder established an agency relationship under which the Holders possessed the authority to exercise that contract right. By default, the Holders could freely transfer their authority to vote the Proxy Shares to someone else. Agency law generally permits the assignment of an agency relationship. 2A C.J.S. *Agency* § 42, Westlaw (database updated Mar. 2022) ("Unless otherwise provided by the parties, a contract of agency ordinarily may be assigned by the agent."). An agent is only prevented from assigning its authority if the agency "involves duties or obligations of personal trust or confidence from the agent to his or her principal, [then] it is not assignable unless the principal consents thereto." *Id.* The No-Assignment Clause overrides these common law rules. It prohibits the Holders from assigning the Irrevocable Proxy in its entirety, and it also prohibits the Holders from

---

[32] *See, e.g.*, *Tracey v. Franklin,* 67 A.2d 56, 58 (Del. 1949) ("An important incident of the ownership of property is its transferability and the proposition is frequently stated in the texts that a general restraint upon alienation is invalid because contrary to public policy."); *P.C. Connection, Inc. v. Synygy Ltd.*, 2021 WL 57016, at *13 (Del. Ch. Jan. 7, 2021) ("In general, contractual rights are freely assignable."); Restatement (First) of Property § 406 cmt. a (Am. Law Inst. 1944), Westlaw (database updated Mar. 2022) ("The established policy of the law is in favor of freedom of alienation."); Restatement (Second) of Property: Donative Transfers div. I., part II., intro. note (Am. Law Inst. 1983), Westlaw (database updated Mar. 2022) ("The rule against direct restraints on alienation is older than the rule against perpetuities.").

assigning any of the rights they possess under the Irrevocable Proxy. Notably, however, the No-Assignment Clause does not place any restrictions on the Stockholder's ability to transfer the Majority Shares.

The Assignment Provision next contains the Holder Exceptions, which identify two narrow exceptions to the prohibition against the assignment of the Irrevocable Proxy or the rights that the Holders enjoy under it. The first of the two Holder Exceptions provides that any Holder, with the consent of the remaining Holders, could assign his rights under the Irrevocable Proxy to a limited partner of Danco LP or an affiliate of a limited partner of Danco LP. JX 5 § 15. Through this provision, a Holder could substitute a new proxyholder, as long as the other two Holders consented, and as long as the person designated possessed the required relationship with Danco LP. That language comports with the Appointment Provision, which appointed each Holder as "as the Stockholder's true and lawful proxy and attorney-in-fact, with full power of substitution." *Id.* § 1.

The second of the two Holder Exceptions provides that the Holders could designate an officer or employee of Danco GP to exercise their rights. *Id.* § 15. In other words, the Holders did not have to exercise the voting power conferred by the Majority Shares themselves; they could give instructions to an officer or employee of Danco GP who would vote as directed. In substance, that direction would constitute an assignment of the Holders power under the Irrevocable Proxy, albeit a limited one. The second of the two Holder Exceptions makes clear that this is permitted.

The Assignment Provision concludes with the Bound Parties Clause, which states: "This Irrevocable Proxy shall be binding upon and inure to the benefit of Stockholder and the Holders and their respective heirs, devises, legatees, personal representatives, agents and permitted assigns." *Id.* Notably, the list of parties identified in the Bound Parties Clause does not refer to transferees. In *Genger Trial*, Chief Justice Strine called out transferees as the logical noun to use to bind subsequent owners of the shares, explaining:

> If [the proxyholder] wanted to keep the Proxy after a transfer, he could have easily inserted clear language—such as "this Proxy shall bind any subsequent transferees"—into the Proxy to that effect. He did not, and thus there is no reason found in the text of the Proxy to indicate that it is binding upon the [subsequent transferee].

2010 WL 2901704, at *20. The omission of transferees is also notable because it appears so often in a legal triplet with successors and assigns, as in "successors, assigns, and transferees."[33]

The parties advance conflicting interpretations of the Bound Parties Clause. Their differing interpretations largely turn on the adjective "their" and the phrase "permitted assigns."

---

[33] *See, e.g.*, *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1214 (Del. 2021) (stockholders agreement "contain[ing] a clause purporting to bind their successors, assigns, and transferees"); *New Castle Cty. v. Pike Creek Recreational Servs., LLC*, 82 A.3d 731, 747 (Del. Ch. 2013) (land use restrictions binding "successors, transferees and assigns"), *aff'd*, 105 A.3d 990 (Del. 2014); *Miramar Police Officers' Ret. Plan v. Murdoch*, 2015 WL 1593745, at *5 (Del. Ch. Apr. 7, 2015) (settlement agreement "binding upon the parties and, among others, their 'transferees, successors and assigns'").

Daniel argues that the Bound Parties Clause causes the Irrevocable Proxy to bind the Stockholder and his assigns. For that interpretation to make sense, the adjective "their" in the clause must refer to "Stockholder and the Holders" collectively. In substance, under Daniel's reading, the Bound Parties Clause would read as follows: "This Irrevocable Proxy shall be binding upon . . . Stockholder, the Holders, and the Stockholder's and Holders' respective heirs, devises, legatees, personal representatives, agents and permitted assigns." By reading the Bound Parties Clause in this way, the clause encompasses the Stockholder's "permitted assigns." Because there is no language in the Irrevocable Proxy that limits the Stockholder's ability to transfer Proxy Shares, Daniel maintains that the entire universe of transferees is a permitted assign. Therefore, says Daniel, the Irrevocable Proxy binds any buyer of the Majority Shares.

In response, Mrs. Hawkins argues that the Bound Parties Clause causes the Irrevocable Proxy to bind (i) the Stockholder and (ii) the Holders and their permitted assigns. Mrs. Hawkins thus interprets the adjective "their" as only modifying the nearest antecedent, which is "Holders." In substance, under Mrs. Hawkins' reading, the Bound Parties Clause would read as follows: "This Irrevocable Proxy shall be binding upon . . . Stockholder, the Holders, and the Holders' respective heirs, devises, legatees, personal representatives, agents and permitted assigns." Mrs. Hawkins points out that the use of "permitted assigns" supports this reading because the Bound Parties Clause immediately follows the Holder Exceptions, which identify permitted assigns to whom the Holders can assign their rights. Because only the Holders had limitations on their ability to assign their

rights under the Irrevocable Proxy, and given the placement of the clause, the phrase "permitted assigns" only makes sense if it applies to the Holders and not to the Stockholder.

At first blush, both readings are reasonable, resulting in ambiguity. Indeed, the nature of the ambiguity created by the placement of an adjective is a known issue that experts advise drafters to avoid.[34]

When read closely, Mrs. Hawkins' reading is the only reasonable one. It applies the rule of the last antecedent, which is a settled principle of interpretation.[35] It is also the more natural reading. If "their" applied to both "Stockholder" and "the Holders," then the natural way to write the sentence would be to say that "[t]his Irrevocable Proxy shall be binding upon and inure to the benefit of Stockholder, the Holders, and their respective heirs,

---

[34] *See* Kenneth A. Adams, *A Manual of Style for Contract Drafting* 291–99 (4th ed. 2017) (explaining how the placement of a modifier can create ambiguity in various ways, and providing guidance on how to place modifiers in a clause without creating an ambiguity); Tina L. Stark, *Drafting Contracts: How and Why Lawyers Do What They Do* 301 (2d ed. 2014) ("Whenever a modifier follows a compound or a series, an ambiguity may be created.").

[35] *See* 73 Am. Jur. 2d *Statutes* § 129, Westlaw (database updated Feb. 2022) ("Qualifying words, phrases, and clauses are ordinarily confined to the last antecedent or to the words and phrases immediately preceding. The last antecedent, within the meaning of this rule, has been regarded as the last word which can be made an antecedent without impairing the meaning of the sentence." (footnotes omitted)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 144 (2012) (defining the "Last-Antecedent Canon" as "[a] pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent"); *see also Rag Am. Coal Co. v. AEI Res., Inc.*, 1999 WL 1261376, at *4 (Del. Ch. Dec. 7, 1999) ("Ordinarily, qualifying words or phrases, where no contrary intention appears, usually relate to the last antecedent." (cleaned up)).

devises, legatees, personal representatives, agents and permitted assigns."[36] The reading also better fits the structure of the Assignment Provision, which starts with the No-Assignment Clause, continues with the Holder Exceptions, and finishes with the Bound Parties Clause and its specific reference to "permitted assigns." That reference only makes sense for the Holders.

Assuming for the sake of argument that Daniel's interpretation of "their" is correct, Daniel's argument only would prevail if the phrase "permitted assigns" encompasses subsequent owners of the Majority Shares. To advance his reading, Daniel contends that the terms "assigns" and "transferees" are interchangeable.

A Delaware court will interpret "contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). Although "assign" and "transfer" and their variants have similar meanings, they are not equivalent.

---

[36] *See* Bryan A. Garner, *Garner's Modern English Usage* 748 (4th ed. 2016) (explaining that including an "oxford comma" or "serial comma" is always favored "because omitting the final comma may cause ambiguities, whereas including it never will—e.g.: 'A and B, C and D, E and F[,] and G and H.'" (alteration in original)); *accord id.* ("When you write a series of nouns with *and* or *or* before the last one, insert a comma before the *and* or *or*. 'The location study covered labor, tax, freight, and communications costs, all in terms of 1972 prices.' While this rule is not observed by all publishers, it is valid and helpful. Professional magazines follow it frequently, and such authorities as David Lambuth support it. The reason is that the comma before the *and* helps the reader to see instantly that the last two adjectives are not joined. In the example cited, suppose the last comma in the series is omitted; *freight and communications costs* could then be read as one category, though it is not meant to be." (quoting David W. Ewing, *Writing for Results in Business, Government, and the Professions* 358 (1974))).

A transfer is the broader term, and it generally refers to a change involving all aspects of ownership. One transfers property or title, and the recipient is known as the transferee.[37] The transferee receives a full conveyance of the bundle of rights associated with property at issue, and the transferee takes title as the new owner of the property. Familiar usages support this reading. A seller transfers title to property, such as a house or a car. So too with shares. Under Article 8 of the Uniform Commercial Code, an issuer has a duty to register a transfer of shares. 8 *Del. C.* § 8-401. Restrictions on the ability to transfer title to shares are known as transfer restrictions. *See* 8 *Del. C.* § 202.

An assignment is the narrower term, and it generally refers to a change involving specific rights.[38] The assignee generally does not receive the full bundle of rights associated with the underlying property interest, but rather only a subset of those rights. Under Delaware law, this reality is perhaps best reflected in our alternative entity statutes, where an effort to transfer an interest in a limited partnership or limited liability company results in the recipient becoming an assignee who possesses economic rights, but not governance rights. The assignee does not receive the full bundle of property rights associated with

---

[37] *See, e.g.*, *Transfer*, Black's Law Dictionary ("[a] conveyance of title or property from one person to another").

[38] *See, e.g.*, *Assignee*, Black's Law Dictionary (11th ed. 2019) ("[s]omeone to whom property rights or powers are transferred by another"); Restatement (Second) of Contracts § 316 (Am. Law. Inst. 1981), Westlaw (database updated Feb. 2022) (defining "[a]ssignment" as "the transfer of a right by the owner (the obligee or assignor) to another person (the assignee)").

ownership and hence is called an "assignee."[39] This reality is also reflected in contract law, where the original counterparty remains bound under the contract notwithstanding the assignment, unless the new party is substituted through a novation.[40] A person likewise

---

[39] *See* 6 *Del. C.* § 17-702(a) ("Unless otherwise provided in the partnership agreement," "[a]n assignment of a partnership interest does not . . . entitle the assignee to become or to exercise any rights or powers of a partner;" and "[a]n assignment entitles the assignee to share in such profits and losses, to receive such distribution or distributions, and to receive such allocation of income, gain, loss, deduction, or credit or similar item to which the assignor was entitled, to the extent assigned."); *id.* § 18-702(b) ("Unless otherwise provided in a limited liability company agreement," "[a]n assignment of a limited liability company interest does not entitle the assignee to become or to exercise any rights or powers of a member," and "[a]n assignment of a limited liability company interest entitles the assignee to share in such profits and losses, to receive such distribution or distributions, and to receive such allocation of income, gain, loss, deduction, or credit or similar item to which the assignor was entitled, to the extent assigned."). The general partnership statute admittedly uses transferee when addressing the same subject. *See* 6 *Del. C.* § 15-503(a)–(b) ("A transfer, in whole or in part, of a partner's economic interest in the partnership," "[d]oes not entitle the transferee to participate in the management or conduct of the partnership business or affairs, to require access to information concerning partnership transactions, or to inspect or copy the partnership books or records," and "[a] transferee of a partner's economic interest in the partnership has a right" "[t]o receive, in accordance with the transfer, distributions to which the transferor would otherwise be entitled."). The general partnership statute thus supports viewing "transfer" as the more general term, such that "transferee" could be used in place of "assignee."

[40] *See Schwartz v. Centennial Ins. Co.*, 1980 WL 77940, at *2 (Del. Ch. Jan. 16, 1980) ("It is clear that a party cannot escape his duties under a contract by assigning the contract to another. Normally, an assignor remains liable as a surety for performance under an assigned contract: he must indemnify the [obligee] for the act or omissions of the assignee. . . . It is therefore obvious that, absent a finding of novation, [the original obligor] remained liable under its contract with [the obligee]." (citations omitted)); *see also P.C. Connection, Inc. v. Synygy Ltd.*, 2021 WL 57016, at *14 (Del. Ch. Jan. 7, 2021) ("Unless there is a novation, the original obligor remains liable under the contract and stands as a surety for the performance of the party to whom the delegation was made." (citing *Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 370 (Del. 2009))).

might assign a right to receivables or other payments. Consistent with this understanding, provisions forbidding transfers of contract rights are called anti-assignment clauses.[41]

An assignment is thus best understood as a special type of transfer that involves a subset of the bundle of property rights held by the owner. It is therefore possible to speak of a transfer of a particular right, but it is more accurate to speak of an assignment of a particular right.

The proper term to designate a subsequent owner of the Majority Shares would be a transferee, not an assignee. An acquirer of the Majority Shares would receive title to the Majority Shares. The proper term to designate the recipient of some or all of the Holders' rights under the Irrevocable Proxy would be an assignee (or assign). The recipient would receive specific contract rights, but not title to the Majority Shares. The reference to "permitted assigns" in the Bound Parties Clause logically refers to permitted recipients of contract rights from the Holders, not a subsequent owner of the Majority Shares.

To argue that the Irrevocable Proxy uses the terms interchangeably, Daniel cites the Holder Exceptions, which state that the Irrevocable Proxy "may not be *assigned*, except that (a) any Holder may with the consent of the remaining Holders, *transfer* such Holder's

---

[41] *See Meso Scale Diagnostics, LLC v. Roche Diagnostics GMBH*, 2011 WL 1348438, at \*10 (Del. Ch. Apr. 8, 2011) ("Anti-assignment provisions generally provide that the rights and interests under a contract may not be assigned without the consent of the counterparty to the contract."); E. Thom Rumberger, Jr., *The Acquisition and Sale of Emerging Growth Companies: The M&A Exit* § 5:6 (2d ed.), Westlaw (database updated Dec. 2021) ("Anti-assignment provisions typically provide that the contract is not assignable without the consent of the counterparty to the contract.").

rights" to certain other parties. JX 5 § 15 (emphasis added). As noted, an assignment is best understood as a specific type of transfer. In this section, where the provision is plainly speaking to a transfer of contract rights, the terms are functionally equivalent.

In other sections, the drafters of the Irrevocable Proxy recognized a distinction between transferees and assignees, and they used the verb "transfer" to refer to the acquisition of shares. As discussed below, the Addendum contains a restriction on Old MedApproach's ability to transfer the Proxy Shares, and it specifically uses the term "transferee." *See* JX 5 at 5. The third recital also uses the term, stating that "75 of the Shares are being *transferred* by Stockholder to [Old MedApproach] . . . and Stockholder will retain beneficial ownership of 25 Shares*." Id.* at 1 (emphasis added).

 "Not all words that have multiple dictionary definitions create ambiguities. Some words necessarily reveal their meanings in context." Stark, *supra*, at 295 n.2. Read in context, the phrase "permitted assigns" does not refer to a transferee of the Majority Shares. It refers to a permitted assignee of the Holder's rights.

At best for Daniel, the language of the Bound Parties Clause *could* be construed to encompass a transferee of the Majority Shares. Under the principles of construction that govern a proxy arrangement, that is not enough. As in *Genger Trial*, if the parties had wanted the Assignment Provision to cause the Irrevocable Proxy to bind a subsequent owner, then they should have stated clearly that the Irrevocable Proxy binds the Stockholder and the Stockholder's transferees. 2010 WL 2901704, at \*20.

68

### f.    The Additional Documents Provision

Finally, in addition to the operative provisions that this decision has discussed, the Irrevocable Proxy contains a standard provision that commonly appears in commercial agreements, sometimes referred to as a further assurances clause.[42] The version that appears in the Irrevocable Proxy states:

> The Stockholder will, upon request, execute and deliver any additional documents and take such actions as may reasonably be deemed by the Holders to be necessary or desirable to complete the Irrevocable Proxy granted herein or to carry out the provisions and intentions hereof.

JX 5 § 9 (the "Additional Documents Provision"). The Additional Documents Provision thus enables the Holders to require the Stockholder to provide additional documents or take actions necessary or desirable to implement the Stockholder's existing contractual commitments.

Despite the unexceptional language of the Additional Documents Provision, Daniel argues that the provision can be used to create new contractual commitments or to resolve ambiguities in favor of the Holders. That reading is not reasonable. It would convert a mechanism for confirming existing rights and obligations into vehicle for manufacturing

---

[42] *See Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *4 (Del. Ch. Feb. 27, 2020); *Liberty Prop. L.P. v. 25 Mass. Ave. Prop. LLC*, 2009 WL 224904, at *6 (Del. Ch. Jan. 22, 2009), *aff'd*, 970 A.2d 258 (Del. 2009); *see also* 3 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* Form 7.12, at F-7-27 (3d ed. 1998 & 2022 Supp.) (providing sample additional documents provision in stockholders voting agreement and irrevocable proxy); ABA Mergers & Acqs. Comm., *Model Merger Agreement for the Acquisition of a Public Company* 413 (2011) (providing model further assurances clause for Stockholder Voting Agreements).

new ones. A Delaware court will not facilitate a party's efforts to obtain rights it did not secure at the bargaining table. "[I]t is not the job of a [Delaware] court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not." *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

The Additional Documents Provision also is not a self-executing interpretive tool. To invoke it, Daniel would have had to assert an affirmative claim and seek mandatory relief compelling the Stockholder to execute a particular document or take specific action. Daniel did not do that. The Additional Documents Provision has no role to play in this case.[43]

### 4. The Addendum

So far, this decision has discussed the Irrevocable Proxy itself. Through that document, Pike acted in his capacity as the Stockholder to grant the authority conferred by the Appointment Provision to each of the Holders, with the Irrevocable Proxy operating as a bridge to an eventual governance structure in which the Majority Shares would be widely held. Under the Revised Settlement, however, Old MedApproach alone purchased the

---

[43] The Addendum includes a similar obligation to execute additional documents. JX 5 at 6 ("[Old MedApproach] agrees to duly authorize, execute and deliver a restated Irrevocable Proxy reflecting the foregoing promptly after the closing under the Agreement and such other agreements or documents as are reasonably necessary or appropriate to carry out the intent of the foregoing."). Daniel advances the same argument regarding its meaning, which fails for the same reasons.

Majority Shares, and under the common law rules that this decision has discussed, the Irrevocable Proxy would terminate upon the transfer of the Majority Shares.

Jim Boynton, a lawyer with Skadden, Arps, Slate, Meagher & Flom LLP was acting as counsel for Popco and spotted the problem. *See* Daniel Tr. 146–47. He did not believe that the language of the Irrevocable Proxy, standing alone, was sufficient to bind Old MedApproach to the Irrevocable Proxy. He wanted a mechanism for Old MedApproach to sign on to the Irrevocable Proxy once it acquired the Majority Shares. The result was the Addendum.

The Addendum consists of a single, dense paragraph. In its entirety, the paragraph states:

> At any time that [Old MedApproach], or its affiliates, owners, designees or nominees (or their respective successors or assigns) (each a "MedApproach Person") is a beneficial or record holder of any of the Shares or any of the Proxy Shares, [Old MedApproach] hereby agrees (and agrees to cause each other MedApproach Person to agree) that references in this Irrevocable Proxy to "Stockholder" shall mean and include [Old MedApproach] (or such MedApproach Person) with references to "the date hereof" in Section 2(a) being instead a reference to the date of closing under the Agreement), and that [Old MedApproach] is bound (and [Old MedApproach] agrees not to transfer any such shares to any other MedApproach Person unless such transferee agrees in writing satisfactory to the [ ]Holders (other than W. Bradley Daniel) to be bound) by this Irrevocable Proxy as the Stockholder; provided, however, no MedApproach Person shall be deemed the Stockholder for purposes of Section 2 hereof. [Old MedApproach] agrees to duly authorize, execute and deliver a restated Irrevocable Proxy reflecting the foregoing promptly after the closing under the Agreement and such other agreements or documents as are reasonably necessary or appropriate to carry out the intent of the foregoing.

JX 5 at 5–6.

71

The Addendum consists of only two sentences. The first is a drafting monstrosity that contains 156 of the 199 words comprising the Addendum. That lengthy sentence has multiple subparts.

First, the sentence defines the term "MedApproach Person" to consist of Old MedApproach and "its affiliates, owners, designees or nominees (or their respective successors or assigns)." *Id.* (the "Affiliate Definition").

Second, the sentence provides that if Old MedApproach or any other MedApproach Person became a beneficial or record owner of any shares of Danco GP, then

> [Old MedApproach] hereby agrees (and agrees to cause each other MedApproach Person to agree) that references in this Irrevocable Proxy to "Stockholder" shall mean and include [Old MedApproach] (or such MedApproach Person) with references to "the date hereof" in Section 2(a) being instead a reference to the date of closing under the Agreement).

*Id.* (the "Expanded Stockholder Definition").

> Third, the sentence states:

> [Old MedApproach] is bound (and [Old MedApproach] agrees not to transfer any such shares to any other MedApproach Person unless such transferee agrees in writing satisfactory to the [ ] Holders (other than W. Bradley Daniel) to be bound) by this Irrevocable Proxy as the Stockholder . . . .

*Id.* (the "Transfer Restriction").

As this decision has noted several times, the very existence of the Addendum undercuts Daniel's argument that the parties expected the Irrevocable Proxy to run with the Majority Shares. If the Irrevocable Proxy clearly provided for that outcome, then there would have been no need to draft the Addendum, let alone the Transfer Restriction.

72

Popco's experienced legal counsel clearly did not think the Irrevocable Proxy extended to subsequent transferees, since he insisted on including the Addendum. Daniel Tr. 197.

The Addendum is not a model of clarity, and it contains internal inconsistencies. For example, both the Transfer Restriction and Old MedApproach's promise that it "is bound" by the Irrevocable Proxy stand in tension with the Expanded Stockholder Definition, because if the language of the Expanded Stockholder Definition meant what it says, then Old MedApproach already was bound by the Irrevocable Proxy. In light of the Expanded Stockholder Definition, Old MedApproach should not have needed to bind itself to the Irrevocable Proxy.

For purposes of this case, the critical aspect of the Addendum is the Transfer Restriction. Unlike the Irrevocable Proxy, the Transfer Restriction represents an obvious attempt to prevent a subsequent owner from selling the Majority Shares unless at least certain buyers agreed to be bound by the Irrevocable Proxy. Not surprisingly, the parties disagree about the scope of the Transfer Restriction.

Mrs. Hawkins reads the Transfer Restriction literally. She argues that it only applies to a transfer of the Majority Shares by Old MedApproach to a MedApproach Person. She notes that the operative language does not contain any mechanism to bind the MedApproach Person who acquires the Majority Shares such that the same restriction would apply to subsequent transfers. As a result, the Transfer Restriction would apply only to a single transfer. That is technically what the Transfer Restriction says: "[Old MedApproach] agrees not to transfer any such shares to any other MedApproach Person

73

unless such transferee agrees in writing . . . to be bound" by the Irrevocable Proxy. JX 5 at 5. This language only contemplates a transfer by Old MedApproach. It does not encompass a subsequent transfer by another MedApproach Person.

Mrs. Hawkins correctly points out that Old MedApproach already transferred the Majority Shares. As part of the MedApproach Restructuring, Old MedApproach conveyed the Majority Shares to the Partnership. JX 17 at '883, '917. As Old MedApproach's successor,[44] the Partnership qualified as a "MedApproach Person," and the Partnership agreed to be bound by the Irrevocable Proxy. As a result, Mrs. Hawkins says that the purpose of the Transfer Restriction has been fulfilled, and its terms no longer restrict the Partnership from transferring the Majority Shares.

Daniel argues that the Transfer Restriction applies to anyone acquiring the Majority Shares. For support, he points to language in the Affiliate Definition. To reiterate, it defines a MedApproach Person as "[Old MedApproach], or its affiliates, owners, designees or nominees (or their respective successors or assigns)." JX 5 at 5. Daniel contends that by using the plural, i.e., "successors or assigns" as opposed to the singular "successor or assign," the drafters demonstrated an intent for the Transfer Restriction to apply to all future transfers. He also argues that it would not make sense for the Transfer Restriction only to apply to a single transfer, because then the restriction could be evaded easily. He

---

[44] *See* Dkt. 82. at Appendix A (defining "Old MedApproach" as "the [p]redecessor entity" to the Partnership).

74

concludes that the Transfer Restriction must apply to any transfer, to any buyer, always and forever.

The parties thus present two extreme readings, one which reads the Transfer Restriction as applying to only a single, initial transfer, and the other which reads the Transfer Restriction as applying to every transfer that ever happens. A third reading is also possible, which better harmonizes the language of the Addendum with the Irrevocable Proxy. Under that reading, the Transfer Restriction (i) applies to any transfer by one MedApproach Person to another MedApproach Person, and (ii) a MedApproach Person only means an entity or individual affiliated with MedApproach, not a third party.

Contrary to Mrs. Hawkins' reading, it does not make sense to read the Transfer Restriction as only applying to a single, initial transfer by Old MedApproach. The need for the Irrevocable Proxy stemmed in part from the complex entity structure that Pike created to control the Project. The parties were necessarily aware of how easily an entity could transfer the Majority Shares to an affiliate. The Skadden lawyer who demanded the Addendum certainly understood that possibility. Although Mrs. Hawkins is correct that the Transfer Restriction literally applies only to a transfer by Old MedApproach, that reading produces an irrational result. It would become so easy to circumvent the Transfer Restriction as to render it surplusage.

Contrary to Daniel's reading, it does not make sense to interpret the term "MedApproach Person" as applying to every transfer, forevermore, including a transfer to a third party. Starting with perhaps the most obvious point, the term "MedApproach

75

Person" implies an affiliation with Old MedApproach. It would be odd to describe a third party as a "MedApproach Person." By definition, a third party would not have any connection to Old MedApproach.

The language of the Affiliate Definition also does not evidence an intent to encompass a third party. The Affiliate Definition encompasses Old MedApproach and "its affiliates, owners, designees or nominees (or their respective successors or assigns)." The terms "affiliates, owners, designees or nominees" refer to parties with close ties to Old MedApproach. They do not refer to third parties.

To reach the opposite conclusion, Daniel relies on the parenthetical reference to "their successors or assigns" to broaden the scope of the definition. But once again, the use of "their" creates ambiguity. Under the rule of the last antecedent, the phrase "*their* respective successors or assigns" refers back to "affiliates, owners, designees and nominees." It thus encompasses a successor or assign of an entity in one of those capacities, and none of those terms encompasses third parties. To argue for a different reading, Daniel must assert that the phrase "*their* respective successors or assigns" also refers to Old MedApproach itself. In the abstract, that is another possible reading, and it is sufficient to render the provision ambiguous.

Assuming that the phrase "successors or assigns" applies to Old MedApproach, it is not clear that the phrase would encompass a third party. Daniel again argues that "assigns" and "transferees" are synonymous, but this decision has rejected that contention. If the drafters had intended to include transferees in the Affiliate Definition, they easily

76

could have done so. The fact that the term appears in the Transfer Restriction, two sentences later, indicates that the drafters knew how to refer to transferees and chose not to include the term in the Affiliate Definition. The term "transferee" is the obvious noun to use to bind a subsequent owner. As this decision has noted, it was the term that Chief Justice Strine suggested in *Genger Trial*, and it is a term that frequently appears in the legal triplet of "successors, assigns, and transferees."

The omission of any reference to transferees is also significant because the Addendum as a whole, and the Affiliate Definition in particular, were drafted in the context of a known transfer of shares from Pike to Old MedApproach and when the parties were contemplating future transfers of shares. If the parties had intended to bind subsequent third parties to the Irrevocable Proxy, the Affiliate Definition was an obvious place to put that language. Yet it is absent.

The best reading of the Transfer Restriction is that (i) it applies to any transfer by one MedApproach Person to another MedApproach Person, and (ii) a MedApproach Person only means an entity or individual affiliated with Old MedApproach, not a third party. The Transfer Restriction obligates Old MedApproach to ensure that in any transfer to an affiliated entity, the affiliated entity agrees to remain bound by the Irrevocable Proxy. The Transfer Restriction thus prevents Old MedApproach from circumventing the Irrevocable Proxy through one or more affiliate transfers. The plain language of the Addendum does not go further and restrict a transfer to an unaffiliated third party.

77

### 5. The Finding Regarding The Irrevocable Proxy

The Irrevocable Proxy does not plainly provide that it binds a subsequent owner of the Majority Shares. There is language which might be construed in that fashion if read broadly and in Daniel's favor, but that is not sufficient. The Addendum demonstrates that the parties themselves did not believe that the Irrevocable Proxy would bind a subsequent purchaser of the Majority Shares. The Addendum contains the Transfer Restriction, but that provision does not encompass a third party of the Majority Shares.

As a result, "the language of the Proxy itself does not plainly indicate that the Proxy [is] to run with the [s]hares if they are sold." *Genger Trial*, 2010 WL 2901704, at *20. Accordingly, the Irrevocable Proxy does not run with the Majority Shares.

### 6. Extrinsic Evidence

Because of the interpretive principles that govern a proxy arrangement, extrinsic evidence is not relevant to the analysis. If the court were to consider it, the extrinsic evidence would be inconclusive. It does not establish that the parties intended for the Irrevocable Proxy to run with the Majority Shares.[45]

---

[45] Both Mr. Hawkins and Daniel gave extensive testimony about the negotiations that led to the creation of the Irrevocable Proxy and the interests and beliefs of those involved. Those events took place before the turn of the current millennium. Although both witnesses generally seemed credible, their testimony about negotiations that occurred over two decades ago was not sufficiently reliable to support factual findings without corroboration. In addition to the degradation of human memory that occurs naturally over time, their recollections were necessarily influenced by their decades-long disputes with each other. They also have powerful personal interests in the outcome of the case. It would be consistent with the nature of human memory for their recollection to evolve over time to favor their current positions. For an accessible mass-market entry point into the relevant

When the parties drafted and executed the Irrevocable Proxy, events were unfolding rapidly.[46] The revelation of Pike's criminal history had created a crisis for the Project. Popco had sued Pike and was seeking to terminate the sublicense. Everyone's priority at the time was to eliminate Pike's control over the Project immediately.

Faced with these exigencies, the parties did not fully consider all of the details of the Irrevocable Proxy or potential alternatives.[47] They drafted the Irrevocable Proxy to provide a time-sensitive means of divesting Pike of his control over the Project. The evidence does not support a finding that the Irrevocable Proxy was intended to create a permanent corporate governance structure. Indeed, the record reflects that the structure was not intended to be permanent.

---

science, interested readers can consult two entertaining podcast episodes from Malcolm Gladwell. *See Revisionist History: Free Brian Williams,* Pushkin Indus. (June 7, 2018); *Revisionist History: A Polite Word For Liar*, Pushkin Indus. (May 31, 2018). As a result, the court approached the witness testimony about temporally distant events with caution.

[46] *See* Daniel Tr. 128–29 (describing the "rapid movement" at the time of the negotiation of the Pike Buyout); *id.* at 137 ("So, you know, I think it was just because in the moment, things were happening so fast, we just needed to lock it in as quickly as possible."); *id.* at 145–46 ("[W]e could have structured it differently, probably should have structured it differently during that time frame, but everything was moving so fast, we were just doing the best that we could in that moment.").

[47] *See id.* at 136 ("In retrospect, I mean, I wish we just would have bought out 100 percent of Joe's interest and so forth. But there was no magic to that number as far as 75 percent."); *id.* at 136–37 ("You know, there were, you know, probably better ways to structure this, such as the investors who were investing in ND Management, that should have probably just been [a] limited partnership interest and so forth. But this was just the way that we could immediately take control of the [P]roject. And when I say 'we,' I mean, I'm really talking about the investors of Neogen and MedApproach and everybody, to take control from Joe. And we wanted that to be quite clear.").

To argue that the Irrevocable Proxy was intended to confer permanent control on the Holders, Daniel relies on the Settlement Memorandum, which was sent to the limited partners in Danco LP to solicit their support for the original Settlement Agreement and invite them to become Participating Investors. As Daniel correctly observes, the Settlement Memorandum explained that voting control of Danco GP would be "turned over" to the Holders through the Irrevocable Proxy. JX 2 at 2. But there is nothing in the Settlement Memorandum which suggests that the Holders would maintain voting control permanently. And there is no discussion in the Settlement Memorandum about what would happen to the Irrevocable Proxy if the Majority Shares were sold.

Daniel also relies on the Offering Memorandum that was distributed in connection with the Rescission Offer. Daniel claims that the Offering Memorandum portrayed the Irrevocable Proxy as a durable corporate governance arrangement, and he cites language that says a majority of the limited partners in Danco LP consented to "the transfer of interests in, and change in control of, [Danco GP]" and "the transfer of voting control of [Danco GP] to the [Holders]." JX 13 at 76. Once again, that language does not state that the Irrevocable Proxy would be permanent, nor does it describe what would happen upon a sale of the Majority Shares. Daniel also points to the financial projections in Exhibit C to the Offering Memorandum that projected the payment of proxy fees and expenses through the end of 2003. *Id.* at Ex. C. Five years of projected payments does not indicate a never-ending commitment. Finally, he points to the Offering Memorandum's disclosure that the elimination of the Irrevocable Proxy would constitute a "Change of Control" under Danco

80

Labs' agreement with Popco and entitle Popco to terminate the license.[48] *Id.* at 95–96. Daniel argues that the termination right demonstrates that Popco wanted the Irrevocable Proxy to remain in place. Perhaps, but it also shows that Popco believed that the Irrevocable Proxy could terminate, and it shows that Popco protected itself against that eventuality. Popco did not view the Irrevocable Proxy as a perpetual corporate governance feature.

There is also extrinsic evidence that cuts against Daniel's arguments. When Freeman resigned as a Holder, he stated that he was doing so in part because "upon the completion or termination of the current financing, restructuring, [and] rescission efforts, the role of [ ] Holder is no longer necessary." JX 16 at 1. Freeman was deeply involved in the Settlement Agreement and the Recission Offer. *See, e.g.*, Daniel Tr. 125–26. Freeman's pre-litigation understanding is persuasive evidence that the Irrevocable Proxy was not meant to last forever.

Defense counsel tried to discredit Freeman's letter by claiming that after the implementation of the Settlement Agreement, Freeman became volatile, then died by suicide two years after his resignation, evidencing a struggle with mental health issues. Dkt. 56 at 24; G. Hawkins Tr. 93; Dkt. 82 at 14 n.10. Freeman's tragic circumstances do not rank as competent evidence that would undercut the reliability of the statements in his

[48] The Offering Memorandum defined a Change of Control as "any change in the equity ownership of [Danco GP], [Danco LP], or the Licensee, or any arrangement as to voting or other management rights . . . that results in less than 50.1% of all such rights with respect to the Licensee being owned or controlled, directly or indirectly, by either (i) the [ ] Holders or (ii) Messrs. Daniel and Freeman." *Id.* at 95.

letter. Instead, Freeman's letter constitutes a statement against interest under Delaware Rule of Evidence 804(b)(3), which renders admissible a "statement which was, at the time of its making, so far contrary to the declarant's pecuniary or propriety interest . . . that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true." D.R.E. 804(b)(3). Freeman's resignation was against his pecuniary interest, and a reasonable person would not have argued himself out of a job unless he believed his account.

Finally, the Settlement Agreement contemplated that Pike's complex system of entities would be collapsed in a restructuring so that the Project could have a more conventional system of corporate governance.[49] The Irrevocable Proxy would terminate in that restructuring. Once again, it was not meant to be permanent.

The interpretive principles that govern a proxy arrangement make resorting to extrinsic evidence inappropriate. If considered, the extrinsic evidence would be inconclusive. The events in question took place decades ago, the documentary record is sparse, the witnesses' memories seem influenced by their litigation positions, and the

---

[49] *See* SA §§ IV(A)(2); *see also* G. Hawkins Tr. 37 ("I believed and I've always thought that the proxy was a requirement by Popco to make sure that Pike would never get control again and that that structure was, at least to my mind, not considered to be permanent and that there would be a reorganization of the general partner and the limited partners to make it look more like a corporate structure."); Daniel Tr. 138 ("I do know that Joe had -- he had a lot of different entities that just didn't seem that they needed to be in place. They just didn't need to exist. They didn't really serve a purpose. And, again, in this moment, it wasn't a priority. The priority was to remove Joe from control. But the concept of NewCo at that time would have been, and was, just to kind of clean it up in the future.").

evidence points in different directions. The extrinsic evidence does not establish an intent to have the Irrevocable Proxy run with the Majority Shares.

## B.    The Scope Of Daniel's Fiduciary Obligations

For the second major issue in the case, Mrs. Hawkins sought a declaratory judgment that Daniel has a fiduciary duty to maximize the value of the Majority Shares for the benefit of the limited partners of the Partnership. She seeks a declaration that to fulfill that obligation, Daniel must sell the Majority Shares free and clear of the Irrevocable Proxy.

In response to Mrs. Hawkins' contentions, Daniel has argued that he owes competing fiduciary and contractual obligations, which prevent the sale of the Majority Shares free and clear of the Irrevocable Proxy. Daniel acknowledges that he controls Danco LP through Holdings, the Partnership, and Danco GP. He then asserts that as a result of that control, he owes fiduciary duties not only to the Partnership and its limited partners, but also to Danco LP and its limited partners. *See In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991). Daniel also claims that he, Holdings, and the Partnership owe some form of duties, express or implied, to Danco LP and its limited partners under the Settlement Agreement and based on disclosures in the Rescission Offer.

Daniel's claim of fiduciary conflict smacks of desperation. As the party that controls Danco GP through the Majority Shares, the position of Daniel and Holdings when selling the Majority Shares is directly analogous to a controlling stockholder selling its control block. The seller's duties in that context are quite limited, arise from tort principles, and are generally restricted to not selling to a known looter. *See Ford v. VMware, Inc.*, 2017

83

WL 1684089, at *9–10 (Del. Ch. May 2, 2017). A sale to a known looter thus would be problematic, but beyond that, the risk of conflicting duties is slim.

The claim based on the Settlement Agreement also seems forced. The parties to the Settlement Agreement were Pike and the Participating Investors—Old MedApproach, Rush, and Freeman. Old MedApproach has dissolved. Freeman has died. All of the contractual obligations under the Settlement Agreement have been satisfied. It would be a stretch at this point to find obligations that run to Danco LP and its limited partners, but perhaps creative lawyers could advance arguments. Pondering more general theories based on the Rescission Offer is even harder, precisely because the theories are so vague.

Fortunately, the court does not need to hazard any guesses on these subjects at this time. When the plaintiff filed this action, Daniel was canvassing the market to solicit interest in the Majority Shares. Daniel stopped his efforts in response to this litigation, and he agreed at trial not to take any action pending the outcome of this litigation. That commitment enabled the parties and the court to conduct post-trial proceedings in the ordinary course. That commitment also raises the question of whether a declaration regarding the scope of Daniel's fiduciary duties is ripe for judicial determination.

"Delaware courts decline to exercise jurisdiction over a case unless the underlying controversy is ripe, *i.e.*, has matured to a point where judicial action is appropriate." *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (cleaned up). A dispute is not ripe where "it has not yet assumed a concrete or final form." *Id.* at 1211. "To address a matter before the facts surrounding the dispute are fully developed

necessarily not only increases the risk of an incorrect judgment in the particular case, but risks, as well, an inappropriate or unnecessary step in the incremental law building process itself." *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 (Del. Ch. 1987) (Allen, C.). "Delaware courts do not render advisory or hypothetical opinions." *XL Specialty*, 93 A.3d at 1217.

At this point, how Daniel will proceed presents a hypothetical question. For the court to address what Daniel can or cannot do in light of his competing obligations would constitute an advisory opinion. If Daniel takes action that Mrs. Hawkins believes constitutes a breach of Daniel's fiduciary duties to the Partnership, then a ripe dispute will exist. If Daniel threatens to take action that Mrs. Hawkins believes constitutes a breach of Daniel's fiduciary duties, then a ripe dispute may exist. For now, the question of how Daniel's fiduciary duties would operate is non-justiciable.

### III.    CONCLUSION

Judgment will be entered for Mrs. Hawkins on her request for a declaration that the Irrevocable Proxy does not bind a subsequent owner of the Majority Shares. The declaratory judgment also will provide that under the Addendum, the Partnership is not obligated to demand that an unaffiliated third party bind itself to the Irrevocable Proxy.

Within thirty days, the parties will submit a proposed final judgment that has been agreed as to form. If there are issues that need to be addressed before a final judgment can be entered, then the parties will submit a joint letter outlining those issues and proposing a schedule for their resolution.

85